**CHRYSLER CREDIT CORPORATION, a Delaware corporation, Plaintiff-Appellee,**

v.

**Charles M. REBHAN, Defendant-Appellant.**

**No. 87–5359.**

United States Court of Appeals, Eleventh Circuit.

April 21, 1988.

Robert A. Solove, Miami, Fla., for defendant-appellant.

Philip A. Allen III, Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, Fla., for plaintiff-appellee.

Before HILL, Circuit Judge, HENDERSON [*], Senior Circuit Judge, and VINING [**], District Judge.

VINING, District Judge:

Charles Rebhan, a debtor in bankruptcy, appeals from the district court's order affirming the partial final judgment entered by the bankruptcy court. In particular, the appellant challenges the district court's affirmance of the bankruptcy court's determination that a particular debt was not dischargeable under sections 523(a)(4) and (6) of the Bankruptcy Code, 11 U.S.C. §§ 523(a)(4), 523(a)(6), and reinstatement of the appellee's cause of action under section 523(a)(2)(B), which the bankruptcy court had earlier dismissed with prejudice. For the following reasons we affirm the district court's order affirming the bankruptcy court's partial final judgment.

The appellant and his brother, Douglas Rebhan, incorporated and commenced operation of a business venture known as Coral Gables Imported Cars, Inc., which did business under the name of Kalamazoo Chrysler Plymouth ("dealership"). The dealership was located in Kalamazoo, Michigan. In order to commence operations, the appellant invested $75,000 in the dealership. He and his brother became the sole directors, officers, and shareholders. Despite holding these positions in the dealership, the appellant continued to reside in Miami, Florida, for virtually the duration of the dealership's operation. In his brother's absence, Douglas Rebhan became primarily responsible for managing the dealership's

---

[*] See Rule 34–2, Rules of the U.S. Court of Appeals for the Eleventh Circuit.

[**] Honorable Robert L. Vining, Jr., U.S. District Judge for the Northern District of Georgia, sitting by designation.

affairs. The appellant did, however, maintain periodic contact with his brother regarding the management of the dealership through regular monthly phone calls and at least one personal visit. The dealership operated from March 1979 until November 1980 when Chrysler Credit Corporation ("Chrysler"), closed and liquidated the dealership.

Chrysler's decision to close and liquidate the dealership involves a complicated set of facts. Shortly after the dealership began operation, it entered into a series of agreements with Chrysler to facilitate its operations. Chrysler provided the dealership with a capital loan and a line of credit to finance purchases of new and used cars to be held as inventory. In addition, the dealership executed a "corporate form signatory authorization" which appointed Chrysler and its officers and employees as the dealership's "attorneys-in-fact" for the execution of all documents necessary to Chrysler's financing the dealership's car purchases. These agreements entered into on behalf of the dealership were authorized by appropriate corporate resolution.

Chrysler held perfected security interests in each individual car it financed as well as the proceeds from all car sales. The appellant executed two personal continuing guarantees by which he assumed the responsibility as primary obligor to honor all of the dealership's obligations to Chrysler. The dealership further promised to separate car sales proceeds from other operating funds and to immediately remit sales proceeds to Chrysler.

This set of agreements and contracts between a car dealership and a financing corporation is commonly known as a "floor-plan arrangement." A typical condition for entering into such a floor-plan arrangement is an agreement by the dealership to allow the financing corporation to conduct regular audits of the dealership's inventory. The dealership in this case agreed to allow Chrysler to conduct such audits, and, in fact, Chrysler's representatives conducted monthly or bi-monthly audits of the dealership's inventory after operations began in 1979. All inventory audits conducted by Chrysler up to and including the one conducted on August 27, 1980, disclosed that the dealership had satisfactorily accounted for all cars and all sales proceeds in which Chrysler maintained perfected security interests.

On October 23, 1980, Chrysler conducted another routine audit of the dealership's inventory. That audit disclosed that twelve cars subject to security interests had been sold and the sales proceeds received by the dealership were not paid to Chrysler. At that point, Chrysler demanded immediate payment and an accounting. The dealership failed to satisfy Chrysler's demands, and Chrysler decided at that point to close and liquidate the dealership. Because of the failure to sell the cars and remit the proceeds as contemplated in the floor-plan arrangement, Chrysler designated the twelve automobiles as having been "sold out of trust."

During the course of liquidation, the dealership sold an additional twelve cars which were confirmed as part of its inventory for the October 23, 1980, audit. Proceeds from the sale of these twelve cars *were* remitted to Chrysler according to the floor-plan arrangement. However, the original sold-out-of-trust condition persisted. This fact was revealed when the appellee conducted the final inventory audit on November 7, 1980. The sold-out-of-trust condition involving the twelve cars produced a deficit for Chrysler in the amount of $68,689.89.

Chrysler instituted suit in North Carolina ("the North Carolina action") to collect on the personal guarantee executed by the appellant. Shortly thereafter, the appellant filed a voluntary petition for bankruptcy and Chrysler's action on the personal guarantee was stayed. As the bankruptcy proceeded, Chrysler instituted an adversary action objecting to the dischargeability of the debt which the dealership allegedly owed it for the twelve automobiles sold out of trust.

## I. NON–DISCHARGEABILITY UNDER SECTION 523(a)(6) OF THE BANKRUPTCY CODE

The bankruptcy court[1] first considered whether the appellant's debt was non-dischargeable because the conversion of the proceeds was alleged to be "willful and malicious." Section 523(a)(6) provides that a willful and malicious conversion is a non-dischargeable debt in bankruptcy. The bankruptcy court found that the appellant did willfully and maliciously convert the sales proceeds from the twelve cars. According to the bankruptcy court's order, the appellant did not dispute that the twelve cars were sold out of trust or that the sale proceeds had been converted. Rather, the appellant contended that he could not be held responsible for the conversion due to the fact that he was not actively engaged in the operation of the dealership. The bankruptcy court rejected the appellant's contention for three reasons.

First, relying on a verified counterclaim[2] filed by the appellant in the North Carolina action which stated that the appellant was engaged in the "active, substantial, and continuing personal participation in the management of the dealership's operations," the bankruptcy court determined that the appellant was judicially estopped from later maintaining that he was not actively engaged in the operation of the dealership. Second, the bankruptcy court concluded that other evidence presented at trial was in accordance with the appellant's prior admissions regarding his active and substantial participation in the dealership's operations. In particular, the court noted that the appellant made monthly telephone calls to Kalamazoo during which the dealership's operations were discussed. Furthermore, the bankruptcy court also found that the appellant made a personal visit to Kalamazoo to attend to the dealership's operations in August of 1980.

Third, the bankruptcy court found that the defendant had actually received some of the converted sales proceeds from the cars sold out of trust. In reaching this conclusion, the bankruptcy court relied heavily on the following factual findings: Contemporaneous with the commencement of the dealership's operations, the appellant and his brother formed T.K.R. Agency, Inc. ("TKR"). TKR was created to circumvent Michigan law and to allow the dealership to receive a commission on sales of credit life insurance which was routinely offered to individuals purchasing automobiles from the dealership. Catherine and Nina Rebhan, wives of the appellant and Douglas Rebhan, respectively, functioned as the nominal shareholders of TKR. However, the appellant and his brother actually conducted TKR's affairs. Normally the dealership collected all credit life insurance premiums and remitted them to the insurance underwriter, American Way Service Corporation ("American Way"), which would then send all commissions earned on the insurance sales back to TKR. Those commissions were then paid in the form of dividends to Catherine and Nina Rebhan.

Some time early in September 1980, the dealership and TKR deviated from the normal procedure of remitting premiums and paying commissions. Rather than remitting premiums directly to American Way, the dealership issued a check for $11,462.51 drawn on the dealership's checking account and payable to TKR. On September 29, 1980, TKR then issued four checks totaling $11,800.00; two checks totaling $5,900.00 were payable to Catherine Rebhan. The appellant admitted receiving these two checks made payable to his wife and endorsing the checks with his wife's name and depositing them in his bank account. The bankruptcy court held that the appellant converted some of the proceeds from the twelve cars through the TKR artifice.

Based on the admissions which the appellant made in the North Carolina action, the

---

**1.** This appeal technically involves the district court's affirmance of the bankruptcy court's order. However, because the district court simply adopted the findings and conclusions of the bankruptcy court, the district court's order of affirmance added nothing substantively new to the proceedings. Therefore, for convenience, we refer only to the bankruptcy court's order, 45 B.R. 609, rather than the district court's affirmance of that order.

**2.** The appellant himself did not verify the pleading; the appellant's brother, Douglas Rebhan, verified it.

evidence establishing the appellant's active involvement in the dealership's operations, and the evidence indicating that the appellant converted a portion of the proceeds from the twelve vehicles sold out of trust, the bankruptcy court held that the conversion was willful and malicious and that the appellant's debt was non-dischargeable under section 523(a)(6).

On appeal, the appellant contends that the bankruptcy court's decision with respect to non-dischargeability under section 523(a)(6) was erroneous and, therefore, asks this court to reverse that determination.

In reviewing determinations made by a bankruptcy court, a finding of fact may not be upset unless it is clearly erroneous. Bankruptcy Rules, Rule 8013. On the other hand, if the bankruptcy court's application of law to a particular set of facts is at issue, that application may be reviewed *de novo. See United States v. Winthrop*, 417 F.2d 905, 910 (5th Cir.1969).

Addressing the bankruptcy court's holding that the doctrine of judicial estoppel precludes the appellant from disavowing substantial participation in the management of the dealership, the appellant argues that the bankruptcy court misapplied the judicial estoppel doctrine.

■ Preliminarily, we note that we are not bound in this case to apply any rigid formulation of the doctrine. Had this case originated as a diversity action, it appears this court would be bound to apply the relevant state formulation of judicial estoppel. However, where federal issues are involved, federal courts may look to common law or to the policies supporting the doctrine itself for guidance in establishing an appropriate formulation. *See e.g., Allen v. McCurry*, 449 U.S. 90, 96, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980); 1B J. Moore, Federal Practice, § 0.405[8], at 771 (1974).

Because this is a bankruptcy case, involving federal issues of dischargeability, we are, therefore, free to apply a formulation of the judicial estoppel doctrine as we think proper. We think it proper simply to review the bankruptcy court's application of

judicial estoppel to ascertain whether it was consonant with the policy interests which originally gave rise to the doctrine. The policy interests are simply stated by the doctrine itself. The doctrine of judicial estoppel "is directed against those who would attempt to manipulate the court system through the calculated assertion of divergent sworn positions in judicial proceedings." *Johnson Service Co. v. Transamerica Insurance Co.*, 485 F.2d 164, 174 (5th Cir.1973).

■ Despite the fact that the appellant did not personally verify the pleadings submitted in the North Carolina action, uncontroverted evidence established that the appellant was aware of the contents of the pleadings verified by his brother and that his attorney of record signed the pleadings on his behalf both on the original and amended versions of the pleadings.

The appellant does not contest the fact that the pleadings were filed on his behalf by his counsel of record. While the appellant did not actually set his own hand to verify the pleadings, he knew of their contents and sought, through the maintenance of his counterclaim against Chrysler, to avail himself of the benefits to be derived from claiming substantial participation in the dealership. Now, however, claiming substantial participation works to his detriment and he seeks to disavow all participation in the dealership.

Since this is precisely the type of calculated assertion of divergent sworn positions which the judicial estoppel doctrine abhors, we must affirm the bankruptcy court's application of judicial estoppel.

Even if we determined that the bankruptcy court had erroneously applied judicial estoppel, we would nevertheless hold that such application was harmless error. The determination that the appellant engaged in substantial management of the dealership did not result exclusively from the imposition of judicial estoppel. The bankruptcy court also found as a matter of fact that the appellant had engaged in substantial management activities.

■ The bankruptcy court determined that the evidence of repeated phone calls to his brother and his visit to the dealership established the appellant's personal involvement in the dealership. We cannot say that the bankruptcy court's factual finding of personal involvement was clearly erroneous.

Finally, the appellant advances an all encompassing argument to the effect that the bankruptcy court erred because Chrysler failed to demonstrate by clear and convincing evidence that the appellant willfully and maliciously converted the property of another.

■ There is no question but that the party seeking to except a debt from discharge must prove the willfulness and maliciousness of the act by clear and convincing evidence. *See Matter of Wise*, 6 B.R. 867 (Bankr.M.D.Fla.1980). Several lines of case authority exist which attempt to meaningfully define "willful and malicious". Notwithstanding the divergent interpretations generated by the several lines, this circuit has yet to expressly adopt a particular definition.[3]

The seminal case defining the standards applicable to the "willful and malicious injury" exception is *Tinker v. Colwell*, 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), wherein the Supreme Court held that personal malevolence was not required and that a willful act was one done intentionally and voluntarily. The Court stated: "[W]e think a willful disregard of what one knows to be his duty, an act which is against good morals, and wrongful in and of itself, and which necessarily causes injury and is done intentionally, may be said to be done willfully and maliciously, so as to come within the exception." This language was subsequently interpreted to stand for two holdings.

One line of cases focused on "willfulness" and interpreted *Tinker* to hold that willfulness could be established upon a finding of a reckless disregard of duty. *See, e.g., Harrison v. Donnelly*, 153 F.2d 588 (8th Cir.1946). The second line of cases focused on "malicious" and interpreted *Tinker* to hold that a finding of constructive or implied malice alone was enough to satisfy the malice requirement. No showing of special malice was necessary. *See, e.g., Bennett v. W.T. Grant Co.*, 481 F.2d 664, 664 (4th Cir.1973). Both of these earlier definitions flowed from interpretations of section 17(a)(2) of the former Bankruptcy Act, 11 U.S.C. § 35(a)(2).

Congress amended the Bankruptcy Code in 1978. In the official comments appended to the changes to section 17(a)(2), which became 11 U.S.C. § 523(a)(6), Congress stated: "To the extent that *Tinker v. Colwell* [citations omitted] held that a less strict standard is intended, and to the extent that other cases have relied on *Tinker* to apply a 'reckless disregard' standard, they are overruled." Senate Report, No. 95–989, 95th Cong. 2d Sess. (1978), 1978 U.S.Code Cong. & Admin.News 5787, 5865; House Report, No. 95–595, 95th Cong., 1st Sess. (1977), 1978 U.S.Code Cong. & Admin.News 5963, 6320. This official comment caused some confusion because *Tinker's* reckless disregard standard had been incorporated in determinations of both "willful" and "malicious," and nothing in the comment revealed whether Congress intended to overrule the application of recklessness to the "willful" prong or the "malicious" prong or both; this confusion generated more divergence with respect to the holding of *Tinker*.

One line of cases uncompromisingly holds that *Tinker* precluded application of the reckless disregard standard to a determination of either "willful" or "malicious." *See In re Hodges*, 4 B.R. 513 (Bankr.W.D. Va.1980). The *Hodges* court held that the "willful" requirement was satisfied by a showing that the act was committed intentionally and the "malicious" requirement was satisfied by a showing that the act was

---

3. In *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556 (11th Cir.1987), this court, in a case strikingly similar to the instant case, upheld a district court's determination of non-dischargability under section 523(a)(6). The court, with no discussion of the controlling legal definition of "willful and malicious," easily concluded that based on the facts before it, the debtor "clear[ly] ... caused a willful and malicious injury to [the creditor]." *Id.* at 1559.

committed with an intent to harm the creditor. *Id.* at 516.

Some courts were dissatisfied with the results of applying *Hodges.* By using the subjective standard of "intent to harm" to prove malice, section 523(a)(6) was eviscerated because proof of such intent was essentially impossible absent an admission by the debtor. *See In the Matter of Lewis,* 17 B.R. 46 (Bankr.W.D.Ark.1981). To avoid the perceived harshness of *Hodges,* some courts began exploring avenues for reincorporating the implied or constructive malice standard that existed prior to the 1978 bankruptcy amendments.

One approach advocated essentially disregarding the legislative commentary overruling *Tinker,* since the legislative history was not always conclusive, but merely helpful, in divining legislative intent. *CreditThrift of America v. Auvenshine,* 9 B.R. 772 (Bankr.W.D.Mich.1981).

A second approach elected to abide the legislative commentary overruling *Tinker* but then reasoned that *Hodges'* "intent to harm" standard for malice was subject to two interpretations: first, specific subjective intent to harm the creditor can establish malice, or, second, knowledge, without actual ill-will, that one's acts will harm a creditor and then acting in the face of that knowledge, could also establish malice. *Wisconsin Finance Co. v. Ries,* 22 B.R. 343 (Bankr.W.D.Wis.1982).

Finally, the third approach held that Congress, by its legislative commentary, overruled only the application of the reckless disregard standard to the "willful" requirement. Congress did not intent to disturb the application of reckless disregard to the malice requirement. *United Bank of Southgate v. Nelson,* 35 B.R. 766, 774 (N.D.Ill.1983). It appears that this approach now predominates.

In *United Bank of Southgate* the court noted that in the legislative commentary, immediately preceding the passage wherein Congress expressly overruled *Tinker's* use of reckless disregard, appears the following prefatory statement: "Under this paragraph, willful means deliberate or intentional." Senate Report, No. 95–989, 95th Cong., 2d Sess. (1978), 1978 U.S.Code Cong. & Admin.News, 5787, 5865; House Report, No. 95–595, 95th Cong., 1st Sess. (1977), 1978 U.S.Code Cong. & Admin.News 5963, 6320. Based on this passage the *United Bank of Southgate* court determined that the entire legislative comment on paragraph (6) of section 523(a) defined only willful. Therefore, the court held that Congress did not alter the other interpretation of *Tinker* which allowed implied or constructive malice to satisfy the "malicious" requirement, and thereby rejected the *Hodges* approach. We hold that the approach adopted by the *United Bank of Southgate* court is the better interpretation and hereby adopt it as the law in this circuit; therefore, malice for purposes of section 523(a)(6) can be established by a finding of implied or constructive malice.

At trial of the instant action, the appellant adduced evidence tending to show that the proceeds from the twelve automobiles sold out of trust were somehow misplaced by Chrysler by virtue of some internal bookkeeping error. The evidence disclosed that Chrysler used a code of "C–3" on its inventory sheets to signify that it had received payment for cars delivered to the dealership. In addition, the appellant introduced evidence to show that the code C–3 appeared on the inventory sheet beside each of the twelve cars. On the basis of this evidence, the appellant argued that Chrysler's own books disclosed that it had received payment for the twelve cars and the fact that the proceeds cannot now be located is not probative of the appellant's alleged conversion.

To rebut this argument, Chrysler adduced evidence showing that the code C–3 did not necessarily mean that proceeds for the automobile had been received. In fact, the evidence indicated that the C–3 code had multiple meanings. To further satisfy its burden of proving by clear and convincing evidence that the appellant willfully and maliciously converted the funds, Chrysler adduced evidence showing that the appellant had received funds from TKR in a manner which was wholly inconsistent with its normal procedure of receiving pro-

ceeds from the dealership and disbursing payments to its officers and shareholders.

In response to the evidence adduced by Chrysler, the appellant argued that the receipt and payment of proceeds by TKR was a legitimate transaction. However, the appellant put forth no evidence to support this position. The appellant's failure to provide such evidence must be given some weight because the financial books and records by which the legitimacy of the transactions could be proved, were in the possession of the dealership and the appellant.

Upon evaluating Chrysler's evidence, the bankruptcy court concluded that the appellant's debt was non-dischargeable under section 523(a)(6). Implicit in that determination is a finding that the appellant willfully and maliciously converted Chrysler's property. In light of the standard for determining willfulness, *i.e.* whether the act was intentional, and the evidence adduced by Chrysler to establish this fact, it is apparent to us that the bankruptcy court was not clearly erroneous in finding that Chrysler had established willfulness by clear and convincing evidence. Applying the standard for malicious enunciated in *United Bank of Southgate* to the relevant evidence, we are persuaded that the bankruptcy court again was not clearly erroneous in finding that Chrysler had established maliciousness by clear and convincing evidence.

The bankruptcy court's determination that the appellant was not entitled to a discharge of his debt pursuant to section 523(a)(6), for the willful and malicious conversion of Chrysler's funds in the amount of $68,689.09, is hereby AFFIRMED.[4]

## II. CHRYSLER'S CLAIM UNDER SECTION 523(a)(2)(B)

■ Following the filing of its original complaint seeking to hold the appellant's debt non-dischargeable, Chrysler attempted to amend its complaint to add an additional count. That count alleged that the appellant had made materially false representations to Chrysler in financial statements upon which Chrysler relied in extending the dealership credit. Because of these alleged misrepresentations, Chrysler sought to have all of the appellant's debts owed to it declared non-dischargeable. The total amount of indebtedness is approximately $257,000, including the $68,689.89 already held non-dischargeable.

Chrysler was unsuccessful in adding this additional count to its complaint. In its partial final judgment, the bankruptcy court stated that its earlier order precluding Chrysler from so amending its complaint was without prejudice. Therefore, in the final partial judgment the bankruptcy court stated that it would schedule a separate trial on this count and allow Chrysler to proceed with this claim.

The appellant contends that the bankruptcy court's order which precluded Chrysler from pursuing the additional claim was actually with prejudice. The appellant contends that because the bankruptcy court simply adopted the proposed findings of fact and conclusions of law submitted by Chrysler, it somehow overlooked the fact that it was changing its former position.

This court need not reach the issue of whether the bankruptcy court was astute enough to comprehend the contents and significance of its own order, since we can resolve this dispute simply by reference to Rule 7054 of the Bankruptcy Rules which expressly incorporates Rule 54(a)-(c), Federal Rules of Civil Procedure, in adversary proceedings. Rule 54(b) allows a court to revise any order, which adjudicates fewer than all claims, before the court enters an order adjudicating all claims. Since the order which dismissed the section 523(a)(2)(B) claim was a pre-trial order which adjudicated fewer than all claims, the bankruptcy court may, by a subsequent

---

**4.** After holding that the appellant was not entitled to a discharge of his debts of $68,689.09 under section 523(a)(6), the bankruptcy court went on to hold that the appellant was also not entitled to a discharge by virtue of section 523(a)(4) of the Bankruptcy Code. Having determined that the appellant's debt is non-dischargeable under section 523(a)(6), it is unnecessary to address the section 523(a)(4) non-dischargability claims.

order, modify a previous order, provided that such modification occurred before the entry of an order adjudicating all claims. We hold the bankruptcy court's final partial order effectively modified its previous order. The bankruptcy court's order allowing Chrysler to pursue its claim under section 523(a)(2)(B), minus the amount of debt determined non-dischargeable under section 523(a)(6), is AFFIRMED.

AFFIRMED.