**In re Paul K. BERMAN, Dr., Debtor.**

**Sheryl CORSI and David Corsi, her husband, Plaintiffs,**

v.

**Paul K. BERMAN, Dr., Defendant.**

**Bankruptcy No. 92–21477–BKC–SMW.**
**Proc. No. 92–0704–BKC–SMW–A.**

United States Bankruptcy Court, S.D. Florida.

June 1, 1993.

Daniel E. Jacobson, Fort Lauderdale, FL, for plaintiffs.

Ira Gordon, Miami, FL, for defendant.

## *MEMORANDUM OF DECISION*

HARRY C. DEES, Jr., Bankruptcy Judge.

On July 30, 1992, Sheryl and David Corsi filed their AMENDED COMPLAINT against Paul K. Berman, the debtor. The court held a trial on the AMENDED COMPLAINT on March 2 and 3, 1993. At the trial the court granted the debtor's motion for a directed finding under 11 U.S.C. § 523(a)(2)(B) and (4). The court took the remaining matters under advisement following the time allowed for submitting proposed findings of fact and conclusions of law and responses thereto. For the reasons set forth below, the court grants the

plaintiffs' AMENDED COMPLAINT and finds that the debtor's obligation to them is excepted from his discharge under 11 U.S.C. § 523(a)(2)(A) and (6).

## *Jurisdiction*

Pursuant to 28 U.S.C. § 157(a) and the special authorization, assigning the undersigned to hear certain cases in the United States Bankruptcy Court for the Southern District of Florida, this case has been referred to this court for hearing and determination. After reviewing the record, the court determines that the matter before it is a core proceeding within the meaning of § 157(b)(2)(I) over which the court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This entry shall serve as findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rule of Bankruptcy Procedure 7052.

## *Background*

The debtor, a doctor of osteopathy, filed his voluntary petition under Chapter 7 of the Bankruptcy Code on April 6, 1992. Prior to that time, on July 22, 1991, the plaintiffs received a state court judgment in the amount of $206,850 against the debtor and his professional association for medical malpractice (Plaintiffs' Exhibit I).[1] The plaintiffs also received a $10,019.69 cost judgment against the debtor and his professional association (Plaintiffs' Exhibit J). In their AMENDED COMPLAINT the plaintiffs alleged that: (1) the surgical procedures which the debtor performed on Sheryl Corsi ("Mrs. Corsi") resulted in the disfiguring of her breasts, thighs, abdomen, and hips; (2) the debtor induced Mrs. Corsi to have a breast augmentation, although she originally sought to have only liposuction; (3) the debtor represented to Mrs. Corsi that he was a certified cosmetic surgeon; (4) the debtor failed to inform Mrs. Corsi prior to her operation that he had lost his surgical privileges at various

---

**1.** The state court judgment accrues interest at the rate of 12% per annum (Plaintiffs' Exhibit I).

hospitals and therefore had to perform cosmetic surgeries in his office; (5) the debtor represented that he was certified by the American Academy of Cosmetic Surgery, the American Academy of Cosmetic Breast Surgery, and the American Academy of Liposuction Surgery, but failed to inform Mrs. Corsi that these academies are self-designating bodies, not recognized by the American Board of Medical Specialties, the American Medical Association, or the American Osteopathic Association; (6) the debtor began doing cosmetic surgery with little or no professional training, having attended only three short seminars on the subject before he operated on Mrs. Corsi; (7) the debtor failed to inform Mrs. Corsi of his lack of experience in cosmetic surgery before performing surgery on her; (8) the debtor decorated his office with newspaper and magazine articles commending his abilities in cosmetic surgery, but did not advise Mrs. Corsi that the articles were paid advertisements that he had written; (9) Mrs. Corsi relied on the articles in selecting the debtor to perform her cosmetic surgery; (10) the debtor failed to have an escrow account, malpractice insurance, or an unexpired irrevocable letter of credit sufficient to pay a malpractice judgment against him in violation of Florida Statute 459.0085; and (11) the debtor neglected to post a sign in his office, notifying the public that he was not carrying professional liability insurance in violation of Florida Statute 459.-0085. Based on these allegations and others, the plaintiffs asserted that the debtor's obligation to them should be excepted from discharge under 11 U.S.C. § 523(a)(2), (4), and (6).[2] The challenges under § 523(a)(2)(A) and (6) remain for the court's consideration.

At trial the debtor testified that he graduated from Kirksville College of Osteopathic Medicine.[3] The debtor received no training in cosmetic surgery in medical school. Following graduation, the debtor trained in general surgery and received his license to practice osteopathic medicine in the State of Florida. The debtor testified that the extent of his experience in cosmetic surgery prior to obtaining his license to practice medicine was assisting in two or three breast augmentations during his residency. One to two years into his practice, the debtor spent a week with a plastic surgeon in Atlanta.[4] Approximately eight years later, in February 1987 the debtor attended a three-day seminar entitled "Liposuction for Beginners" sponsored by the American Academy of Cosmetic Surgery and the American Society of Liposuction Surgery. In March 1987 the debtor had four days of training with a cosmetic surgeon during which the debtor did one or two breast cases. The debtor agreed that in 1987 he relinquished his privileges to do general surgery at two of the three hospitals where he performed surgery, submitting that he resigned "under pressure" because he refused to give illegal "kick-backs." The debtor testified that he opened the Body Contour Institute in April 1987[5] and performed his first breast augmentation in July 1987. At the end of July 1987 he attended a three-day "Cosmetic Breast Surgery Workshop," also put on by the American Academy of Cosmetic Surgery and the American Society of Liposuction Surgery. In October 1988 and January 1989 the debtor attended two three-day meetings sponsored by the American Academy of Cosmetic Surgery and the American Society of Liposuction Surgery.

The debtor agreed that he operated on Mrs. Corsi on March 16, 1989, and that she obtained a judgment against him for malpractice. The debtor testified that he had done 100 to 150 breast augmentations and about 15 "circumareolar mastopexies" before operating on Mrs. Corsi. He indicated that if his patients had problems, he admitted them to the Florida Medical Center

---

**2.** The amended complaint incorrectly listed the subsections of the statute.

**3.** The debtor was unable to recall what year he graduated.

**4.** The debtor could not recall the surgeon's name.

**5.** At about the same time the debtor opened the Rectal Laser Institute in his office.

because he had surgical privileges there.[6] The debtor testified that he could perform mastopexy and breast augmentation at the Florida Medical Center, beginning when he became an associate member of the Discipline of Osteopathic Plastic and Reconstructive Surgery. His privileges did not include the authority to do other types of cosmetic surgery. The debtor agreed that he was not eligible to perform either breast augmentation or liposuction at the Florida Medical Center when he operated on Mrs. Corsi in 1989.

The debtor testified that he wrote most of the articles and advertisements which appeared in newspapers and were framed in his office, although his name did not appear on them as the author. The articles discussed his cosmetic surgery practice. The debtor stated that he viewed the articles as part of a marketing program to let people know what he did and where he did it. He agreed that the Department of Professional Regulation for the State of Florida reprimanded him on more than one occasion for the content of the advertisements. In one instance the debtor failed to include an appropriate disclaimer in the advertisement and in another he improperly listed the credentials of several of the organizations in which he holds memberships. The debtor denied showing the plaintiffs the advertisements in his waiting room and denied telling them that he was a board certified cosmetic surgeon. He agreed that he told Mrs. Corsi that he was a cosmetic surgeon, although he actually was only a general surgeon. The debtor testified that he had to be extremely careful in describing his credentials because of the "turf war" between cosmetic and plastic surgeons.[7] The debtor stated that he told Mrs. Corsi that he was a member of the American Academy of Cosmetic Surgery, the American Society of Liposuction Surgery, and the American Society of Cosmetic Breast Surgery and explained to her that the groups were not "fly-by-night" organizations. The debtor stated that although

the organizations are self-designated and the American Osteopathic Association, the American Medical Association, and the State of Florida do not recognize them, the American College of Osteopathic Surgery grants continuing medical education credits for courses which the organizations offer.

The debtor testified that he told Mrs. Corsi that he had been doing cosmetic surgery for less than a year. He noted that the patient history form and consultation sheet which Mrs. Corsi filled out prior to meeting with the debtor included a checklist of applicable consultation matters, such as neck, chin, facial wrinkling, breasts (with two choices—augmentations or "Lift Berman Circumareolar Mastopexy"), and liposuction on various body areas. The debtor agreed that he included only these consultation matters on the sheet, because they were the only procedures he could perform in his office. The debtor testified that Mrs. Corsi checked only liposuction on the consultation sheet. He agreed that he offered Mrs. Corsi a discount of $300 if she had liposuction and breast surgery done at the same time, but could not recall if he suggested that Mrs. Corsi have cosmetic work done on her breasts. He agreed that he did not suggest that Mrs. Corsi see a plastic surgeon for a second opinion before having surgery. The debtor testified that he told Mrs. Corsi that she would look beautiful after her surgery. He conceded that he did not go over the surgery consent form with Mrs. Corsi, although he discussed the main risks and problems with her prior to the surgery. The debtor testified that he delegated the task of going over the consent form to his office staff and was unaware that Florida law obligated him to go over the form with his patients.

The debtor acknowledged that he used two form operative reports for the procedures he performed on Mrs. Corsi. He agreed that Mrs. Corsi was unsatisfied with the complications that she suffered as

---

6. The debtor testified that he took a medical leave of absence from the Florida Medical Center after July of 1991.

7. Plastic surgeons apparently can perform certain procedures which cosmetic surgeons are not authorized to perform.

a result of her surgery and admitted that he did not document her complaints on her chart. The debtor explained that the "Berman Circumareolar Mastopexy"[8] which he performed on Mrs. Corsi involves removing a wedge of breast tissue directly above the nipple in order to obtain a lifting of the breast. He indicated that because of the location of the incision and the fact that it extends all the way through the breast, the incision sometimes opens up following surgery. The debtor testified that he wrote Mrs. Corsi a prescription for medicine after her surgery and failed to note it in her chart, although the law required him to do so. He further agreed that his office is not (and was not) certified by an accrediting organization and that he had no medical malpractice insurance coverage to cover Mrs. Corsi's claim. The debtor testified that he did the best he could to make Mrs. Corsi look as good as possible and denied that he intended to injure her or deceive the plaintiffs. In the debtor's opinion, the results of Mrs. Corsi's surgery were "excellent." He testified that the sole damage to Mrs. Corsi's breasts were small scars.

The debtor agreed that when he renewed his license in 1989, he swore to the Department of Professional Regulation that he would pay any judgment obtained against him, but failed to do so. The debtor stated that he had a sign in his office, stating that he did not carry malpractice insurance, at the time Mrs. Corsi came into his office.[9] The debtor testified that after attending a risk management seminar in October 1987, he dropped his malpractice insurance coverage and increased his disability insurance coverage. The debtor explained that he elected not to carry malpractice insurance because his insurance company settled a malpractice claim against him for $175,000 without his permission. He noted that Edward S. Truppman, M.D. ("Dr. Truppman"), the plaintiffs' medical expert, prepared an opinion favorable to the plain-

tiff in that case. The debtor conceded that he entered into a consent agreement with the Department of Professional Regulation whereby he cannot regain his license to practice medicine in the State of Florida until he is no longer legally obligated to pay Mrs. Corsi's judgment against him, shows that he actually carries malpractice insurance coverage, and passes a psychiatric examination ("Plaintiffs' Exhibit L").[10] Pursuant to the consent agreement the debtor received a reprimand from the Florida Osteopathic Association. The debtor testified that the state medical review board found no probable cause of malpractice against him in Mrs. Corsi's case, although the jury in the later state court trial did.

Dr. Truppman testified as a medical expert on behalf of the plaintiffs. Dr. Truppman obtained his medical degree from the University of Minnesota Medical School in 1955 and is licensed to practice medicine in Minnesota and California. Dr. Truppman currently serves as Vice–Chairman of the Board of Directors and Chief of Plastic Surgery at Palmetto Hospital, Chief of Plastic Surgery at Parkway General Hospital, and staff member at Jackson Memorial Hospital. Aside from other training, Dr. Truppman completed a two-year residency in plastic reconstructive surgery at the University of Illinois Research and Educational Hospitals and Presbyterian St. Luke's Hospital in Chicago, Illinois, following his graduation from medical school. Dr. Truppman is a board certified plastic surgeon, having passed a two-day written and oral examination concerning a wide range of plastic surgical procedures to receive the designation. Dr. Truppman has served as an examiner for the Board of Plastic Surgery for 18 years. In addition, Dr. Truppman served as President of the American Society for Aesthetic Plastic Surgery; founder and President of the American Association for the Accreditation of

8. The debtor named the procedure after himself.

9. The debtor agreed that in his deposition he testified that he did not have malpractice insurance for a period of three years prior to July 31,

1991, and that he did not post signs informing his patients of the lack of coverage.

10. The debtor explained that he had a nervous breakdown and was forced to stop practicing medicine.

Ambulatory Plastic Surgery Facilities for nine terms; member of the American Society of Plastic and Reconstructive Surgery; member of the Southeastern Society of Plastic and Reconstructive Surgery; member of the Florida Society of Plastic and Reconstructive Surgery; President of the Greater Miami Society of Plastic and Reconstructive Surgery for five terms; member of the Dade County, Florida Southern, and American Medical Associations; fellow of the American College of Surgeons; and Assistant Professor of Plastic Surgery at the University of Miami School of Medicine. Dr. Truppman indicated that the American Medical Association recognizes all of the organizations of which he is a member. Dr. Truppman also serves as Secretary of the Board of Directors and member of the Claims Committee of the Physicians' Protective Trust Fund, which insures approximately 5,700 physicians in the State of Florida. Dr. Truppman has testified before the United States Senate on the subject of cosmetic surgery. In his deposition Dr. Truppman indicated that although he reviews from two to five cases of medical malpractice every week, he has testified on behalf of plaintiffs in only four cases. Dr. Truppman's deposition at 48. He explained that "it is with great reluctance that [he] testif[ies] on behalf of a plaintiff against a fellow physician." Id. at 22.

After examining Mrs. Corsi in his office on January 3, 1990, Dr. Truppman wrote the following opinion letter to Mrs. Corsi's attorney:

I first saw your client, Cheryl [sic] M. Corsi on 1/3/90. This 32 year old white female went to Dr. Berman and had a suction assisted lipectomy of the thighs, abdomen and hips and a bilateral augmentation mammoplasty performed on 3/16/89. Following the procedure she had delayed healing, requiring secondary suturing of the medial superior periareolar incisions.

At the present time she complains of excessive scarring of the medial superior quadrants of the periareolar incisions, ptosis of the breasts, and marked irregularity and dimpling of the medial thighs, abdomen and hips.

Physical examination reveals an attractive, 32 year old white female with marked ptosis of the breasts with the nipple/areolar complexes being well below the inframammary creases. The periareolar scars are located medial and superior and measure 2½ by 4 cm on the left and 2.2 by 3 cm on the right. There is epithelial bridging in four areas on the right. The diameter of the nipple/areolar complexes bilaterally are 7 cm on the right and 6½ by 7 cm on the left.

Examination of the abdomen reveals excessive dimpling and rippling of the abdominal skin with areas of inadequate removal of subcutaneous fat. There is excess scarring in the areas in which the cannulas were introduced, the lateral aspect of her previous cesarean section the scars are dimpled and adherent to the underlying muscle fascia [sic]. Laterally the incision made for the suction of the hips is superior to the desired location and they are presently 1½ by 0.5 cm. Examination of the medial aspects of both thighs reveal [sic] dimpling and ripple effect. Examination of the lateral trochanteric areas, lateral hips and flanks reveal [sic] inadequate removal of subcutaneous fat.

I would recommend that she have a bilateral mastopexy as well as secondary suction assisted lipectomy of the thighs, hips and abdomen. Three months later by [sic] a [sic] abdominoplasty would complete the reconstruction.

The fee for the bilateral mastopexy would be $5,000.00 and additional hospital costs of approximately $5,000.00 to $6,000.00. The anesthesiologist's fee would be approximately $1,000.00. The secondary suction assisted lipectomy of the above mentioned areas would be $3,500.00 and the hospital cost would be approximately $5,000.00, the anesthesiologist charges would be approximately $500.00 to $600.00. The fee for a [sic] abdominal lipectomy would be $5,000.00 and the hospital cost would be approximately $8,000.00, anesthesiologist charges would be approximately $800.00.

The performance of an augmentation mammoplasty in which the nipple/areolar complex is located below the inframammary crease without the simultaneous performance of a mastopexy constitutes practices below the standard of care in this community. The results of the suction assisted lipectomy without the performance of an abdominal lipectomy and the inadequate and disproportionate removal of subcutaneous fat and the locations of the incisions fall below the standard of care in this community. . . .

Plaintiffs' Exhibit C at 1–2.

At trial Dr. Truppman reiterated that the debtor's surgeries on Mrs. Corsi fell below the standard of care in the medical community. Dr. Truppman testified that the degree of malpractice was "profound" and that Mrs. Corsi's case was "as bad a case" as he has seen (both in technique and result), outside of a wrongful death case. Dr. Truppman reviewed several hundred photographs of other cosmetic surgeries which the debtor performed and testified that in his opinion the vast majority showed evidence of malpractice. Dr. Truppman indicated that the debtor performed a "circumareolar mastopexy," [11] a breast augmentation, and liposuction of the abdomen, hips, and thighs on Mrs. Corsi. Dr. Truppman testified that depending on the circumstances and desired results, a surgeon may use a variety of incisions in augmenting a breast, including: a crease underneath the breast (representing three quarters of augmentations performed), an incision around the nipple/areolar complex (usually involving the inferior, rather than the superior portion), and an incision through the armpit or axilla. He testified that the "circumareolar mastopexy" was not appropriate for Mrs. Corsi, because her breasts need more uplifting than the procedure could provide.

Similarly, Dr. Truppman testified that liposuction is not appropriate for every patient, explaining that liposuction is not a substitute for dieting or exercise. Surgical alternatives to liposuction include a dermato-lipectomy (the removal of skin, excess fat, and tissue) and an abdominal lipectomy (which is necessary if any relaxation of the musculature has occurred). Dr. Truppman indicated that a mini-tuck (removal of two or three inches of skin approximately six inches above the pubic hair line) is appropriate only when a patient has minor degrees of musculature relaxation and minor amounts of excess skin. Dr. Truppman testified that the liposuction and mini-tuck which the debtor recommended for Mrs. Corsi were inadequate for her abdominal problems and illustrate the debtor's "profound lack of understanding or knowledge of body sculpture surgery in general." In Mrs. Corsi's case, Dr. Truppman would have recommended an abdominal lipectomy, rather than liposuction and a mini-tuck. He explained that by performing an abdominal lipectomy on Mrs. Corsi, the debtor could have rectified Mrs. Corsi's problems in one surgery, rather than two. Dr. Truppman felt that the debtor's training in liposuction and breast augmentation was inadequate and stated that the debtor had insufficient training to receive hospital privileges to do cosmetic surgery or to obtain medical malpractice insurance for cosmetic surgery.[12] Dr. Truppman noted that the self-designated organizations to which the debtor belongs are not subject to peer review. Dr. Truppman testified that the debtor had a duty under state law to tell his patients that he was not carrying malpractice insurance, to inform them of alternative surgical procedures for their problems, and to keep a record of medications prescribed for them in their charts. Dr. Truppman noted that the debtor's chart for Mrs. Corsi failed to include documentation of alternatives being explained to the patient, thereby indicating that Mrs. Corsi was not totally informed of her options.

---

**11.** Dr. Truppman described the term "circumareolar mastopexy" as a misnomer, noting that the prefix "circum" means "to go all the way around." The surgical procedure which the debtor performed on Mrs. Corsi's breasts involved a crescent excision over the superior portion of the areola, rather than a complete circular excision.

**12.** In his deposition Dr. Truppman testified that plastic surgeons have a minimum of five years of training. Dr. Truppman's deposition at 51.

Dr. Truppman stated that the consent form which Mrs. Corsi signed included a satisfactory explanation of the risks involved in her surgeries, but failed to include authorization for the mastopexy which the debtor performed. In Dr. Truppman's opinion the debtor's post-operative notes for Mrs. Corsi were insufficient. Dr. Truppman testified that Mrs. Corsi would require $25,000 in future medical procedures to correct the damage resulting from the debtor's malpractice.

Mrs. Corsi testified that she found out about the debtor through a television advertisement for the Body Contour Institute and the debtor's newspaper advertisements. Mrs. Corsi testified that she and her husband went to the debtor's office together to discuss getting her hips, abdomen, and thighs reduced. She indicated that she checked those areas on the patient history form given to her in the debtor's office. On the consultation form Mrs. Corsi checked that she was interested in receiving a consultation concerning liposuction of the abdomen, midriff, buttocks, and thighs. She noted that framed articles, praising the debtor's work, hung on the walls of his reception area. None of the articles contained a disclaimer indicating that it was a paid advertisement. Mrs. Corsi indicated that while she was in the waiting room, she saw a video tape recording on liposuction. Mrs. Corsi testified that the debtor first brought up the idea of having work done on Mrs. Corsi's breasts. Mrs. Corsi indicated that she initially refused, but agreed to have the debtor perform breast surgery after he had her try on a brassiere with inserts, told her that her breasts would be firmer as a result of the surgery, and offered her a discount if she had the breast surgery done at the same time as the liposuction. Mrs. Corsi testified that she was adamant that she did not want the breast surgery if it would scar her breasts. She indicated that the debtor assured her that there would be no scarring. Mrs. Corsi stated that the debtor's wife took her into an examination room and showed her the results of the breast surgery that the debtor had performed on her (Mrs. Berman). Mrs. Corsi stated that

Mrs. Berman's breasts looked very nice and had no visible scars. The debtor recommended that Mrs. Corsi have a breast augmentation, a "circumareolar mastopexy," liposuction, and a tummy tuck. Mrs. Corsi stated that she believed that the debtor was recommending the best procedures for her problems.

Mrs. Corsi agreed that she never asked the debtor how long he had been doing cosmetic surgery. She indicated, however, that when she saw his established office, the articles about his work, and the certificates evidencing his membership in numerous medical organizations, she trusted him. Mrs. Corsi noted that he had pictures of models on the walls by the reception area, and that he told her he performed surgeries on centerfold models appearing in "Penthouse" and "Playboy." Mrs. Corsi also testified that the debtor told her husband and herself that he (the debtor) puts on an annual Christmas party for all of his patients so that they have the opportunity to meet one another. Based on that statement, Mrs. Corsi believed that he had been practicing cosmetic surgery for a long time. Mrs. Corsi stated that the debtor told her that he had done the procedures which he recommended for her "hundreds of times" and said, "Trust me, you'll be beautiful." Mrs. Corsi stated that the debtor told her that he was a board certified cosmetic surgeon and she believed that he specialized in that area. The debtor never mentioned that he had been doing cosmetic surgery for less than one year, never revealed his limited training in liposuction and breast augmentation, and never told Mrs. Corsi that he had performed the "Berman Circumareolar Mastopexy" only about 15 times. Mrs. Corsi testified that if she had known the true extent of the debtor's training and experience in cosmetic surgery, she would not have allowed him to operate on her. Mrs. Corsi stated that the debtor never advised her to get a second opinion. Mrs. Corsi testified that when she asked about having the procedure performed in a hospital, the debtor told her that having the procedure done in the office would be much cheaper. He did

not mention that he could not perform the cosmetic procedures at a hospital because he had no privileges to do so. He also did not tell her that he had lost his privileges to do general surgery at two area hospitals and did not have malpractice insurance. Again, Mrs. Corsi testified that she would not have allowed the debtor to perform the procedures if she had known. Although Mrs. Corsi signed the consent forms for her surgeries, she could not remember reading them. She indicated that she signed the forms in the office while the staff was taking her deposits and setting the appointments for the surgeries. She noted that the office was very busy at the time. The office staff told her to sign the forms and she did, thinking that they were standard forms. Mrs. Corsi stated that if she had read the portion of the forms which stated that she would have scars from the procedures, she would not have signed the forms. Mrs. Corsi denied that she knew the risks of the surgeries.

Mrs. Corsi testified that she experienced problems immediately after her surgeries and complained bitterly to the debtor about them. The debtor never recorded Mrs. Corsi's complaints. Mrs. Corsi testified that she could not recall whether the debtor gave her post-operative instructions because she was medicated after the surgeries. Mrs. Corsi indicated that she was in agony for 48–hours after the surgeries, unlike the people on the video tape recording. Mrs. Corsi explained that the debtor had to cut dead skin away from her breasts at least three times on each side, but never recorded doing so in her chart. The debtor also had to restitch her breasts three times, but failed to document the work. Mrs. Corsi stated that she was unaware that the debtor had no medical malpractice insurance until the state court trial on her complaint. She indicated that she did not recall seeing a sign in his office stating that he carried no malpractice insurance. Mrs. Corsi testified that she filed her complaint in this court "to make sure that [the debtor] never cut anyone else up...." Mrs. Corsi stated that she does not have the $25,000 or more that it would cost to have corrective surgery performed to repair the

dimpling of her thighs and hips, to fix her abdomen, and to reduce the severe scarring on her breasts. Mrs. Corsi agreed that the debtor told her that she would need a tummy tuck within three months after her initial surgery. She understood that the cost of the tummy tuck would be an additional $300. Mrs. Corsi later learned that a simple tummy tuck would not remedy the damage to her abdomen, consisting of lumps of different sizes and shapes and wrinkling. Mrs. Corsi stated that the debtor told her that her stomach would be smooth and beautiful after the tummy tuck.

Mr. Corsi testified that he accompanied Mrs. Corsi to the debtor's office after they saw his advertisements on television and in the newspaper. He noted that the advertisements showed beautiful women with nice figures. When they were in the office, the debtor pointed out the articles that were framed on the waiting room walls, saying "Look what they say about me. Everybody loves me." Mr. Corsi stated that at that time he believed that other people wrote the articles about the debtor. He testified that the debtor described the information on the wall as his "accreditations." Mr. Corsi indicated that the debtor told him that he was a cosmetic surgeon and that he had done the procedures which he was going to perform on Mrs. Corsi "hundreds of times." Mr. Corsi stated that some of the pictures on the wall were from the debtor's annual party for his clients. Although Mr. Corsi was against the surgery in the beginning, he testified that he eventually agreed to have the debtor perform the procedures. Mr. Corsi noted that he had complete faith and trust in the debtor until his wife experienced difficulties after her surgeries. Mr. Corsi testified that Mrs. Corsi bled profusely from her breasts, could not get out of bed, cried in pain, could not go to work, and had to return to the debtor's office three or four times after her surgeries as a result of the complications she suffered. He indicated that she still looks in the mirror and cries. Mr. Corsi testified that he discovered at the state court trial that the debtor lied to Mrs. Corsi and himself. Mr. Corsi noted that

the debtor showed him pictures of people whom he claimed were his patients. Mr. Corsi later learned that the people in the photographs were not the debtor's patients. Mr. Corsi testified that the debtor told the plaintiffs that he could save them thousands of dollars by performing the surgeries on Mrs. Corsi in his office. The debtor further indicated that if any problems developed, the hospital was only 10 minutes away from his office. Mr. Corsi testified that if he had known that the debtor was not a cosmetic surgeon, had lost privileges at two hospitals, had been doing cosmetic surgery for less than one year with little training, was unable to do cosmetic surgery at any hospital, and had no malpractice insurance, he would not have let him operate on Mrs. Corsi.

Meron J. Levitats ("Dr. Levitats"), a board certified otolaryngologist and facial plastic surgeon, testified that he worked with the debtor in his office for more than a year beginning in March 1989. Dr. Levitats stated that Dr. Truppman testified against him in a medical malpractice case in 1986. In that case Dr. Levitats prevailed. Dr. Levitats testified that· he felt Dr. Truppman was an impartial witness in his malpractice case. Dr. Levitats stated that he was not aware that the debtor ever intentionally injured a patient or misrepresented Dr. Levitats' and the debtor's positions or specialties, noting that "we recognized ... the fine line we walked in in [sic] the cosmetic surgery community." Dr. Levitats testified that as a result of Mrs. Corsi's medical ˙malpractice case against the debtor, the debtor no longer practices medicine.

Nelva Adler ("Adler"), the debtor's former office manager, testified that the debtor performed a breast augmentation and liposuction on her in 1988. She stated that she was a happy patient and employee. Adler testified that when Mrs. Corsi came to the debtor's office for a consultation, she wanted only a liposuction. Later, Adler showed Mrs. Corsi a video tape recording on breast surgery. Adler indicated that one of her duties as the debtor's employee was to go over the consent forms with patients. She could not recall going over the consent form with Mrs. Corsi. Adler remembered that on one occasion following Mrs. Corsi's surgery, Mrs. Corsi returned to the office to have her incision closed. Carol Hollander ("Hollander"), another former patient of the debtor, testified that he performed breast augmentation on her four years ago. She stated that she went to the debtor's office on February 28, 1989, and was pleased with the office staff because they were very friendly. Hollander indicated that no one guaranteed the results of her surgery. She testified that in the debtor's office to the right of the reception window was a declaration that the doctor did not have malpractice insurance. Hollander stated that the second day after her surgery, she had a stabbing sensation in her left breast. Hollander called the debtor who arranged to meet her at his office on a Sunday morning. She testified that the debtor manipulated the left implant and she felt fine after that.

### Discussion and Decision

The issue before the court is whether the plaintiffs' medical malpractice judgment against the debtor should be excepted from his discharge under 11 U.S.C. § 523(a)(2)(A) and/or (6). Title 11 U.S.C. § 523(a) provides in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; [and]

.    .    .    .    .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity....

11 U.S.C.S. § 523(a)(2)(A) and (6) (Law.Co-op. 1986 and Supp. May 1992). The plaintiff in a dischargeability action must establish the elements of his or her case by a preponderance of the evidence. *Grogan v.*

*Garner,* 498 U.S. 279, 289, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991). The court will discuss each of the relevant subsections of § 523(a) in turn.

**1. Whether the debtor's obligation to the plaintiffs is excepted from his discharge under 11 U.S.C. § 523(a)(2)(A)**

▋ A plaintiff bringing allegations against a debtor under § 523(a)(2)(A) must show that: (a) the debtor made a false representation with intent to deceive the creditor; (b) the creditor relied on the representation; (c) his or her reliance was reasonably founded; and (d) the creditor sustained loss as a result of the representation. *St. Laurent v. Ambrose (In re St. Laurent),* 991 F.2d 672, 676 (11th Cir.1993), citing *Page v. Racila (In re Racila),* 138 B.R. 303, 305 (Bankr.M.D.Fla.1992); *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986); *First Nat'l Bank of Red Bud v. Kimzey (In re Kimzey),* 761 F.2d 421, 423 (7th Cir.1985), citing *Carini v. Matera (In re Matera),* 592 F.2d 378, 380–81 (7th Cir.1979) and *Gabellinni v. Rega,* 724 F.2d 579, 581 (7th Cir.1984); *Minority Equity Capital Corp. v. Weinstein (In re Weinstein),* 31 B.R. 804, 809 (Bankr.E.D.N.Y.1983). These elements are "functionally identical" to the elements of common law fraud. *Smith v. Beeson (In re Smith),* 128 B.R. 488, 490–91 (S.D.Fla. 1991). *Accord St. Laurent,* 991 F.2d 672, 676, quoting *Cardinal Serv. Corp. (In re Jolly),* 124 B.R. 365, 367 (Bankr.M.D.Fla. 1991) (quoting *Bear, Sterns & Co. v. Powell (In re Powell),* 95 B.R. 236, 239 (Bankr. S.D.Fla.1989)).

▋ The court has little difficulty finding that the debtor's conduct falls within the purview of 11 U.S.C. § 523(a)(2)(A). At the trial the plaintiffs credibly testified about their dealings with the debtor. The plaintiffs explained that they learned about the debtor through television advertisements and newspaper articles which acclaimed his success as a cosmetic surgeon. The debtor also ·embellished his office reception area with framed copies of articles praising his abilities in cosmetic surgery, photographs of beautiful models whom he alleged were his patients, and certificates showing his membership in various medical organizations. The debtor pointed out these displays to the plaintiffs when they visited his office. Mr. Corsi stated that because of the manner in which the articles were written, he assumed that others had written the articles about the debtor. Only later did he learn that the articles actually were paid advertisements that the debtor wrote about himself. The debtor himself testified that he told the plaintiffs that the professional organizations to which he belonged were not "fly-by-night" associations. The debtor, however, failed to inform the plaintiffs that the organizations were self-designated and not officially recognized by leading medical groups, such as the American Medical Association and American Osteopathic Association, as well as the State of Florida. The court finds that the debtor carefully drafted the television advertisements and newspaper articles and displayed the membership certificates, articles, and photographs in his office to lead potential patients and their families, such as Mr. and Mrs. Corsi, into believing that he was an experienced, successful cosmetic surgeon. Although the debtor's marketing techniques apparently were effective, the court finds that they also were deceptive.

Weighing the conflicting testimony concerning the debtor's conversations with the plaintiffs, the court finds that the debtor purposefully overstated his credentials and experience to persuade the plaintiffs to have him perform Mrs. Corsi's surgeries. In particular, the court finds that the debtor misrepresented the extent of his experience and training in cosmetic surgery by leading the plaintiffs to believe that he was a certified cosmetic surgeon, showing them photographs of women whom he described as his former patients who actually were not his patients at all, stating that he held annual Christmas parties for his patients and implying that the parties had been ongoing for many years, and falsely telling the plaintiffs that he performed cosmetic surgery on centerfold models. Perhaps most seriously, the debtor induced Mrs. Corsi to have breast surgery which she had

not requested by offering her a deal on the price of the liposuction and breast surgeries if performed together, assured Mrs. Corsi that she would have no visible scars as a result of her breast surgery, and falsely told the plaintiffs that the sole reason for having Mrs. Corsi's surgeries performed in his office was to save the plaintiffs money when in fact the debtor lacked privileges to perform the surgeries at any hospital. The court finds that the debtor was keenly aware of the legal limitations on his office cosmetic practice and cognizant that many of his representations were not only misleading, but blatantly untruthful. Contrary to the debtor's testimony, the court finds that the debtor opened his office cosmetic practice as a last resort after losing his privileges to do surgery at local hospitals. The court believes that the debtor was aware that he had insufficient experience and training to obtain privileges to perform cosmetic surgery at any hospital or to obtain malpractice insurance coverage for his cosmetic practice. The debtor avoided peer review of his work by performing cosmetic surgeries in his office. Through his shrewd marketing techniques and misrepresentations the debtor turned his office practice into a growing business despite his lack of training and competence in the area of cosmetic surgery.

The court concludes that the plaintiffs were reasonable in relying on the debtor's representations and that an ordinarily prudent person contemplating cosmetic surgery would not have perceived the debtor's deception. The debtor himself noted that he was quite careful in describing his qualifications to patients. The court finds that persons, like the plaintiffs, who are not associated with the medical profession would not have readily understood the important distinction between a "board certified cosmetic surgeon" and a "board certified general surgeon who practices cosmetic surgery." In addition, the court finds that the plaintiffs had no reason to suspect that the debtor was lying about his qualifications, experience, and expertise in cosmetic surgery. The court notes that even the debtor's wife represented to Mrs. Corsi that she was pleased with the results of the breast surgery that her husband performed on her and was eager to show off his work. Certainly, if the plaintiffs had known the true extent of the debtor's experience in cosmetic surgery, that he had lost surgical privileges at various hospitals, that the medical organizations to which he belonged were self-designated and not recognized by leading medical associations or the State of Florida, that he had written the articles about himself and paid for their publication, and that he held no malpractice insurance and had no other means of paying malpractice judgments against him, they would not have consented to allow the debtor to perform surgery on Mrs. Corsi.

Through the expert testimony of Dr. Truppman, the plaintiffs also have shown that they suffered loss as a result of the debtor's false representations. The court found Dr. Truppman to be an extremely competent and credible witness with impeccable credentials. Although the debtor attempted to show that Dr. Truppman was a biased witness, the court finds that he was not. Dr. Truppman graphically described the extent of the debtor's malpractice in performing Mrs. Corsi's surgeries in both his opinion letter to Mrs. Corsi's attorney (Plaintiffs' Exhibit C) and his testimony at trial. Dr. Truppman testified that the malpractice resulting from Mrs. Corsi's surgeries was "profound" and "as bad a case" as he has seen outside of a wrongful death case. Considering Dr. Truppman's wealth of experience in dealing with medical malpractice, the court finds that his assessment is significant. Dr. Truppman testified that the procedures which the debtor performed on Mrs. Corsi were inadequate to correct her problems and were improperly executed, illustrating the debtor's "profound lack of understanding or knowledge of body sculpture surgery in general." Dr. Truppman noted that, among other things, the debtor failed to document his treatment of Mrs. Corsi properly in her medical chart and failed to obtain authorization from her to perform the breast mastopexy surgery. Dr. Truppman testified that as a result of the surgeries which the debtor performed and the complications arising therefrom,

Mrs. Corsi suffered excessive periareolar scarring, marked ptosis of the breasts, excessive dimpling and rippling of the abdomen and thighs, and excessive scarring in other areas. In addition, Dr. Truppman testified that the debtor failed to remove adequate portions of subcutaneous fat in the abdomen, trochanteric areas, lateral hips, and flanks. Dr. Truppman indicated that Mrs. Corsi would require $25,000 or more in medical treatment to correct the damage resulting from the debtor's malpractice. The court accordingly finds that the plaintiffs have carried their burden of proof under § 523(a)(2)(A).

**2. Whether the debtor's obligation to the plaintiffs is excepted from his discharge under 11 U.S.C. § 523(a)(6)**

The court further concludes that the debtor's obligation to the plaintiffs is excepted from his discharge under 11 U.S.C. § 523(a)(6). A plaintiff who relies on § 523(a)(6) must show that the debtor injured the plaintiff and that the debtor's actions were both willful and malicious. *Lee v. Ikner (In re Ikner),* 883 F.2d 986, 991 (11th Cir.1989). The legislative history to § 523(a)(6) defines "willful" as " 'deliberate or intentional.' " *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1263 (11th Cir.1988), quoting S.Rep. No. 989, 95th Cong.2d Sess. [79] (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5865; H.R.Rep. No. 595, 95th Cong. 1st Sess. [365] (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5963, 6320. The court in *Chrysler Credit* discussed the split of authority regarding the interpretation of the "willful and malicious" requirement of § 523(a)(6) [13] and concluded that "malice for purposes of section 523(a)(6) can be established by a finding of implied or constructive malice." 842 F.2d at 1262–63. Based on the record before it, the court finds that the debtor committed will-

ful and deliberate acts which resulted in injury to the plaintiffs. As the court noted above, the debtor misrepresented his qualifications and experience to the plaintiffs to induce them to allow him to perform Mrs. Corsi's surgeries. The debtor also failed to reveal that he lacked privileges to do cosmetic surgery at area hospitals, falsely stated that the sole reason for having Mrs. Corsi's surgeries done at his office was to save the plaintiffs money, and assured Mrs. Corsi that she would have no visible scars as a result of her breast surgery. The court concludes that the debtor's misrepresentations were not merely reckless statements made without concern for the interests of others, but were intentional and deliberate.

The totality of circumstances shows that the debtor acted with malice. The court concludes that the debtor knew that if he revealed the true extent of his experience and training in cosmetic surgery and the truth about the other matters which he failed to disclose, the plaintiffs would not have allowed him to perform surgery on Mrs. Corsi. The debtor proceeded with his deceptive scheme, completely disregarding the plaintiffs' interests and ignoring his own lack of competence in cosmetic surgery. The debtor avoided peer review of his work by performing cosmetic surgery in his office. The court finds that the debtor's malice is further shown by his failure to document Mrs. Corsi's complaints following her surgery or to list medications which he prescribed for her problems. The debtor's medical records for Mrs. Corsi illustrate that the debtor continually wrote "healing well," "doing very well," and other positive comments in Mrs. Corsi's chart (Plaintiffs' Exhibit A), when she in fact had serious problems healing properly from the surgeries and was extremely dissatisfied with the results. The debtor's final entry

---

**13.** The Eleventh Circuit noted that the seminal case interpreting the "willful and malicious" requirement was *Tinker v. Colwell,* 193 U.S. 473, 24 S.Ct. 505, 48 L.Ed. 754 (1904), in which the Supreme Court held that personal malevolence was not necessary and that a willful act in disregard of a duty fell within the exception to discharge. 842 F.2d at 1262. In 1978, however, Congress amended the Bankruptcy Code, ex-

pressly overruling the "reckless disregard" standard of *Tinker* in the official comments to § 523(a)(6). *Id.* Since that time courts have debated whether § 523(a)(6) requires proof of actual "intent to harm" in addition to a deliberate or intentional act or whether the "malice" element of the statute may be proved by a showing of implied or constructive malice. *Id.* 842 F.2d at 1262–63.

in Mrs. Corsi's chart stated: "looks excellent" (Plaintiffs' Exhibit A at 6). The court concludes that these entries in the debtor's medical records for Mrs. Corsi show that the debtor attempted to conceal Mrs. Corsi's complications arising from her surgeries and evidence the extent of the debtor's recalcitrance and maliciousness in his dealings with the plaintiffs. At the trial on this matter, the debtor still refused to acknowledge that he had injured Mrs. Corsi, stating that the results of her surgeries were "excellent." Based on all of the evidence presented, the court concludes that the debtor's obligation to the plaintiffs in the amount of the state court malpractice and cost judgments, plus appropriate interest accruing in the amount of 12% per annum to the date of this court's judgment, is excepted from his discharge under 11 U.S.C. § 523(a)(6).

### Conclusion

The court grants in part the relief sought in the plaintiffs' AMENDED COMPLAINT, finding that the debtor obtained money from the plaintiffs through false pretenses, false representations, and actual fraud under 11 U.S.C. § 523(a)(2)(A) and willfully and maliciously injured the plaintiffs within the meaning of § 523(a)(6). The debtor's obligation to the plaintiffs in the amount of $216,869.69, plus interest accruing at the rate of 12% per annum to the date of this court's judgment, accordingly is excepted from his discharge under 11 U.S.C. § 523(a)(2)(A) and (6).

SO ORDERED.