In re Leon DOYAN, Debtor.

Virginia ABRAHAMSON, Plaintiff,

v.

Leon DOYAN, Defendant.

Bankruptcy No. 95–21917–BKC–RBR.
Adv. No. 95–1182–BKC–RBR–A.

United States Bankruptcy Court,
S.D. Florida,
Broward Division.

Aug. 28, 1996.

Manny Singh, Ft. Lauderdale, FL, for Leon Doyan.

Marika Tolz, Hollywood, FL, Trustee.

## MEMORANDUM OPINION AND ORDER DETERMINING NONDISCHARGE-ABILITY OF DEBT

RAYMOND B. RAY, Bankruptcy Judge.

This matter came before the Court for trial on April 16, 1996 and June 4, 1996 upon the Plaintiff/Creditor, Virginia Abrahamson's Complaint to Determine Dischargeability of Debt. Plaintiff, a former patient of the Debtor/physician, seeks an order declaring the debt owed to her pursuant to a medical malpractice judgment non-dischargeable pursuant to § 523(a)(2)(A) and (a)(6).

The Court, having reviewed the Complaint and the entire Court file, having considered the arguments of counsel, the testimony of the witnesses, and the evidence presented, and being otherwise duly advised in the premises, makes the following findings of fact and conclusions of law.

### General Background

1. Defendant was a Florida licensed physician providing medical services to the public. He began practicing in Florida in 1978.

2. Prior to August 30, 1990, Defendant consulted with Plaintiff regarding cosmetic surgery and surgical options. Thereafter, on August 30, 1990, Defendant performed surgery on Virginia Abrahamson, including liposuction, breast augmentation by fat injection, and an abdominoplasty ("tummy tuck").

3. At the time the surgery was performed, the Debtor did not have staff privileges to perform cosmetic surgery at any Florida hospital and operated from his office.

4. In 1993, the Plaintiff filed a medical malpractice suit against Dr. Doyan in Broward Circuit Court, Case number 93–04605, and on February 27, 1994, she recovered a $421,800 jury verdict against the Defendant for medical malpractice.[1] No portion of that judgment has been paid or satisfied.

5. Subsequently, on November 8, 1995, the State of Florida Agency for Health Care Administration Board of Medicine (the "Board") entered a Final Order revoking the Debtor's license to practice medicine, and fining the Debtor $15,000.00. The Final Order adopted the Hearing Officer's Recommended Findings of Fact which include the following:

Due to her medical history, V.A. (Virginia Abrahamson) was an extremely poor candidate for an abdominoplasty.

The pre-operative history and physical examination performed by [Dr. Doyan] … were inadequate.

The pre-operative medical records maintained for the patient, V.A., do not support the course of treatment proposed for the procedures performed.

[Dr. Doyan] did not order a pre-operative lab work-up for the patient, V.A. Such lab order would normally consist of a complete blood count, a urinalysis, electrolytes, blood sugar, blood nitrogen test, and a mammogram or breast examination since the breasts were to be augmented.

Failing to obtain current lab tests … constitutes the practice of medicine below the standard of care, skill, and treatment which a reasonably prudent physician would find acceptable under similar circumstances and conditions.[2]

The surgical or operative notes … are inadequate to fully describe the procedures performed.

---

1. The damage award comprises of: $7,100 for medical expenses, $4,100 for past earnings, $10,600 future damages, $300,000 for past pain, suffering, disability, physical impairment, mental anguish, inconvenience or loss of capacity for the enjoyment of life, as well as $100,000 for future pain and suffering.

2. Dr. Doyan relied upon lab tests performed three months prior to the cosmetic surgery when the Plaintiff underwent a hysterectomy.

V.A. sustained an infection and complications from the wound to her abdomen that took months to heal.

V.A. sustained necrosis which is the death of tissue and which complicated the healing of the abdominal wound.... Given V.A.'s medical history ... the necrosis was almost inevitable.

The procedure used by [Dr. Doyan] (stitching the infected area) fell below the standard of care....

Injecting fat tissue for breast augmentation is inappropriate. Since it is common for the fat tissue to die after injection, the injected tissue then appears on a mammograph as a mass of suspicious origin. (Plaintiff's Exhibit 9).

6. On May 18, 1995, the Defendant filed a voluntary liquidation case under Chapter 7 of the Bankruptcy Code. In his schedules, the Debtor listed the Plaintiff as a creditor having a fixed and liquidated claim in the amount of $421,800.00.

7. Debtor's Schedules, as amended, reveal that the Debtor has no non-exempt assets and has had no attachable assets for a time period of more than one year prior to the Petition date.

8. On August 24, 1995, the Plaintiff timely filed her Complaint to Determine Dischargeability of Debt.

9. Since 1985, the State of Florida has required physicians to either carry malpractice insurance covering at least $100,000 in damages ($250,000 if the physician has hospital staff privileges), or that those who choose to practice "bare" maintain a bond, escrow account or letter of credit such that an aggrieved patient who first proves his/her claim may recover such damages. Fla.Stat. Ch. 458.320. Subsection (5)(g) provides that if a physician chooses not to carry medical malpractice insurance or maintain a bond, escrow account or letter of credit, he/she must abide by certain requirements, including the posting of a sign stating: Under Florida law, physicians are generally required to carry medical malpractice insurance or otherwise demonstrate financial responsibility to cover potential claims for medical malpractice. **YOUR DOCTOR HAS DECIDED NOT TO CARRY MEDICAL MALPRACTICE INSURANCE.** This is permitted under Florida law subject to certain conditions. Florida law imposes penalties against non-insured physicians who fail to satisfy adverse judgments arising from claims of medical malpractice. This notice is provided pursuant to Florida law.

10. At no time between 1988 and the date of the Debtor's Notice of Commencement of Chapter 7 dated June 4, 1995 did the Debtor have malpractice insurance or "financial responsibility" as required by law. Rather, the Debtor maintains that he complied with Fla. Stat. Ch. 458 by posting a sign that read "DUE TO UNAVAILABILITY OF AFFORDABLE LIABILITY INSURANCE, AT PRESENT WE HAVE NO COVERAGE." (Defendant's Ex. A).

11. Dr. Doyan practiced general surgery in 1972 and 1973 in New York and from 1973 to 1978 in Massachusetts. He became licensed to practice medicine in the State of Florida in 1978. In 1989, although Dr. Doyan had nominal training and very little experience in cosmetic surgery, he changed his practice from general surgery to cosmetic surgery and held himself out as a Board Certified surgeon "specializing" in cosmetic surgery. Cosmetic surgery is a sub-specialty of Plastic and Reconstructive Surgery. It is not a sub-specialty of general surgery.

12. Dr. Doyan had few malpractice claims brought against him in the time he practiced as a general surgeon. However, since changing his practice to cosmetic surgery, numerous judgments have been rendered against him for medical malpractice. None of these judgments have been either fully or partially satisfied.

### Plaintiff's Claims

Virginia Abrahamson claims that the Debtor's obligation to her should be excepted from the Debtor's general discharge for fraud, false pretenses, for gross neglect, and for Debtor's intentional violation of law. Her claims under § 523(a)(2)(A) are based on allegations that: (a) Dr. Doyan willfully failed to inform patients, including Plaintiff, that he did not carry *medical malpractice* insurance, and that he had no financial responsibility;

(b) the Debtor misrepresented to the Plaintiff his qualifications and experience; (c) the Debtor misrepresented to the Plaintiff the nature, risks, methods, complications and reasonably expected results of the recommended abdominoplasty; and (d) the Debtor misrepresented to the Plaintiff the nature, risks, methods, complications and reasonably expected results of the recommended breast augmentation procedures, including: (i) the procedures associated with liposuction and injection of fat; (ii) the likelihood of fat reabsorption; (iii) the likelihood of fat necrosis (death of tissue); (iv) the likelihood of fat encapsulation and cyst formation; and (v) possible tumor masking. She also claims that the Defendant did not inform her of known criticism of the procedure by the medical community and that the Defendant exaggerated the relative risks of alternative procedures while offering the "fat injection" procedure at "no cost" to promote his own agenda.

Plaintiff's § 523(a)(6) claims for "willful and malicious injury" are related to (a) the doctor's actual performance and associated pre-operative, operative and post-operative procedures (or the lack of same); and (b) the doctor's failure to comply with the laws regarding the requirement and disclosure of financial responsibility.

### The Evidence

At trial, Virginia Abrahamson testified that Dr. Doyan described the proposed surgeries in such a fashion that they did not seem "like a big deal". The Plaintiff maintains that Dr. Doyan assured her that the expenses would be minimal and that she would be back to work in no longer than two weeks. She also stated that Dr. Doyan induced her into consenting to the fat injection procedure by a representation that it was safe and would be provided "free". Plaintiff believed that Dr. Doyan was fully qualified to perform the surgery. She was never told that Dr. Doyan was new to cosmetic surgery. Rather, she testified that Dr. Doyan stated otherwise and that she relied on this representation. Plaintiff was never told that the procedure has been widely criticized and is not generally accepted by most of the medical community.

She testified that had she known of Dr. Doyan's limited prior experience in cosmetic and plastic surgery, she would not have undergone the procedure prior to obtaining a second opinion. The Plaintiff further testified that the disclosure and consent forms were given to her by the Debtor's wife, Mrs. Doyan, who said that the documentation was "routine". Based thereon, Plaintiff signed each document in the package without review and without the benefit of a specific discussion with Dr. Doyan or a nurse.

The possibility of scarring was of prime concern to the Plaintiff. The Plaintiff relied upon Dr. Doyan's representation that the place and character of the scar from the tummy tuck procedure would be the same as the scar from her recent hysterectomy which was described as a "bikini line" incision. Plaintiff testified that had Dr. Doyan told her there was a possibility that she would have significant new scars, she would not have authorized or consented to the tummy tuck procedure. Furthermore, she stated that had she known that Dr. Doyan had only done a limited number of tummy tucks prior to her surgery, she would not have had him undertake the procedure.

Presently, the Plaintiff has several scars from the attempted tummy tuck which traverse her entire abdomen from hip to hip. The scars are an inch wide and have more than a inch of scar tissue on either side. Plaintiff has been told that it would cost in excess of $50,000 to correct all of the abdominal scars. In addition, the Plaintiff has identified two areas or pockets of fat remaining from the tummy tuck procedure which she says Dr. Doyan represented would be removed.

The tummy tuck procedure performed by Dr. Doyan on August 30, 1990 did not heal until well into January, 1991. During this time period, the Plaintiff was in severe pain, was disabled, and had to undergo multiple corrective procedures. Plaintiff also testified that during this time, she was unable to work or engage in any normal activities. She was completely dependent upon her ex-husband, friends and daughter for food and support.

In 1992, the Plaintiff visited Dr. Mary Beth Tomaselli, a physician specializing in

breast disease. She reported to Dr. Tomaselli that her breasts were in constant pain, she could not lie on her stomach, and that working as a waitress aggravated the pain in her breasts. Subsequently, Dr. Tomaselli removed the fat injections, leaving the Plaintiff with two new scars, one on each breast.

The Plaintiff testified that had she been notified that malpractice insurance was not maintained by Dr. Doyan or his office, she would have questioned the doctor about the subject. Plaintiff recalled seeing the sign (Defendant's Ex. A) that Dr. Doyan displayed in his office, but she attached no particular importance to it. She did not understand that the notice referred to medical malpractice insurance.

Karen Landingham–Smith, the Plaintiff's daughter, testified that she accompanied the Plaintiff on a consultation visit to Dr. Doyan. At that time, she asked Dr. Doyan if breast augmentation by fat injection was "a healthy thing to do." Dr. Doyan assured her that it was. Furthermore, according to Ms. Landingham–Smith, Dr. Doyan was promoting the multiple surgeries, describing how great the Plaintiff would look and how much better she would feel about herself. Her testimony was consistent with that of the Plaintiff when she stated that Dr. Doyan assured the Plaintiff that she would be able to return to work within two weeks of the surgery.

Dr. Eugene J. Strasser, M.D., testified in this case as an expert designated by the Plaintiff. Dr. Strasser is Board Certified in general surgery and in plastic surgery. Dr. Strasser enjoys staff appointments at nine (9) area hospitals.

After reviewing Dr. Doyan's records, obtaining a history directly from the patient, and examining the Plaintiff, Dr. Strasser issued a written report dated August 27, 1992 which contains the following findings:

1. Patient underwent general anesthesia without pre-operative laboratory studies.

2. The intra-operative records, that is the operative procedure, were inadequate.

3. The patient allegedly had an abdominoplasty, according to the records, when in fact, she had a mini-abdominoplasty based on my examination of her.

4. That injection into the breast is a procedure doomed to failure, nevertheless it was performed.

5. The patient developed postoperative complications with breakdown of the wound in the abdomen. The attempted closure of that wound was inappropriate and also doomed to failure.

6. The dismal result obtained is the result of poor intra-operative execution with the inappropriate postoperative care.

Dr. Strasser testified that the lab results relied upon by the doctor were far too old to use in preparation for a general anesthetic procedure. Dr. Strasser did not expect that any hospital anesthesiologist or anesthetist would rely on lab results three months old.

Exhibit "2" to the deposition of Eugene Strasser consists of Dr. Strasser's notes of his consultation with the Plaintiff. Dr. Strasser therein refers to the results of the tummy tuck as a "horrendous deformity". Dr. Strasser further testified that the scarring on Virginia Abrahamson's abdomen was so "extensive that getting rid of all of it (scarring) is not likely". He stated that he had never seen a worse abdominoplasty in his life:

"It was poorly planned, poorly executed, inappropriately treated after complications arose and got a predictable result when you get into something you don't know what you are doing."

Dr. Strasser concluded that the Plaintiff had a "disastrous (mini)abdominoplasty" as the result of poor execution, necrosis and inappropriate post-operative care. In Dr. Strasser's opinion, the Plaintiff's abdominal surgery was "appalling negligence".

With regard to the fat injection procedure, Dr. Strasser testified that, in his opinion, fat injection into the breast is not an accepted procedure anywhere in the United States. The procedure was condemned a number of years ago by the recognized Board of Plastic Surgeons. He stated that the injection of fat for the purpose of augmenting the breast is an absolutely unsafe, inherently dangerous and irrational procedure. He explained that he has examined four to six women who have

had breast augmentation by fat injection, all of whom who have had the fat removed due to the formation of hard lumps in the breast. Dr. Strasser also testified at length that the existence of the fat injections would impair a physician's ability to pick up a true cancer or tumor in the breast.

Dr. Mary Beth Tomaselli, a general surgeon specializing in the treatment of women with breast disease, also testified as an expert in the Plaintiff's case. Her practice is mostly limited to breast surgery. Although practicing for ten years, Dr. Tomaselli has seen only one other patient with fat injection.

Dr. Tomaselli explained that fat injected into the breast can cause pain because once the tissue dies, it appears to adhere to the normal surrounding tissue. She further testified that, to her knowledge, there was no recognized reference material nor body of work in this area of medicine. Dr. Tomaselli was unaware of any doctor in the community that was presently performing or offering breast augmentation through fat injection.

Dr. Tomaselli explained that without having removed the fat-injection lumps, she could not definitively determine if the patient was developing a cancerous tissue in the breast immediately at or around the location of the fat injection. She also testified that although standards vary from hospital to hospital, pre-operative procedures in an otherwise healthy patient about to undergo significant surgery would include a chest X-ray within 30 days, a cardiogram within 30 days, and blood work and urinalysis within about a week of the planned anesthesia.

The only expert testifying on behalf of the Debtor was Gerald W. Johnson, M.D. Dr. Johnson is only licensed to practice medicine in Texas, Arkansas and Wyoming. He is not and has never been licensed to practice medicine in the State of Florida. Dr. Johnson claims to have been recognized in Courts outside the State of Florida as an expert in the areas of plastic and reconstructive surgery.

On cross-examination, Dr. Johnson revealed that he is not certified by a recognized board of medicine and has never been recognized by one of the sub-specialty boards. Furthermore, Dr. Johnson has never been board-eligible in general surgery. In fact, Dr. Johnson did not complete his general surgery residency. Although he claimed to be "board-eligible" in plastic surgery, Dr. Johnson has never taken the full exam, and he failed the written part of the exam.

Although Dr. Johnson disagreed with many of Dr. Strasser's conclusions, Dr. Johnson did not examine the patient in person and based his testimony only upon photographs and other medical records. Dr. Johnson was also not provided with copies of the findings and conclusions of the State of Florida Agency of Health Care Administration in their investigation of Dr. Doyan with regard to Virginia Abrahamson. Furthermore, Dr. Johnson admitted that because he only examined pictures, he could not determine the completeness of the abdominoplasty done on the Plaintiff by Dr. Doyan. Nevertheless, Dr. Johnson did agree with Dr. Strasser that the patient had very extensive scarring.

In his own practice, Dr. Johnson limits fat injection to 200 cubic centimeters ("cc's") of fat. In addition, Dr. Johnson testified that in order to get a good "potential" for fat survival, Dr. Johnson disburses the fat so that it is in contact with a blood supply. Furthermore, Dr. Johnson testified that any mass that is placed in a breast can form a cyst, resulting in difficulty in detecting a small cancer behind it. In response to a hypothetical question, Dr. Johnson admitted that if 100 or 200 cc's of fat were injected into one area in a single large mass, the augmentation would be "doomed to failure."

Dr. Johnson was aware of criticism by the medical community regarding breast augmentation by fat injection. He admitted that the American Society of Plastic and Reconstructive Surgeons has disagreed with the procedure and recommended that it not be done. He testified that in his own practice, he deals with the criticism by carefully examining his methods and procedures, carefully examining his patients, and following up with the patients carefully. Before Dr. Johnson consults with a patient, the patient is shown a videotape presentation regarding the procedures. Dr. Johnson further stated that he has specialized consent forms for breast aug-

mentation by fat injection. Furthermore, Dr. Johnson indicated that during his consultations, he will frequently tell the prospective patients that there are a lot of doctors who disagree with breast augmentation by fat injection.

Dr. Johnson agreed that as a general rule, a patient should have pre-operative laboratory studies before undergoing a procedure with general anesthesia. The doctor agreed that it was unacceptable to perform procedures under general anesthesia without a laboratory study within three months of the procedure and that to do otherwise would be a deviation from the standard of care. Dr. Johnson also agreed that the intraoperative records of Dr. Doyan were inadequate to interpret what occurred during the procedures with Plaintiff.

Dr. Doyan also testified at trial. He testified that he decided not to carry malpractice insurance in 1987. One of the reasons for terminating the coverage was that he was upset at his insurance company for settling a case with a former patient. Dr. Doyan explained that when he carried malpractice insurance, he had no control in determining whether or not a claim was meritorious and should be paid. Although Dr. Doyan claims that he would pay a "meritorious claim," it is evident from his testimony and the bankruptcy schedules that he has no intention of paying or settling any malpractice claims. The doctor testified that he is the "sole judge" of whether or not a claim is meritorious and that the finding, conclusion or verdict of any judge, jury or administrative body is irrelevant to him. Despite Dr. Doyan's asserted expertise in determining whether or not someone is "genuinely" injured or disabled because of negligence on his part, five or six judgments have been rendered against him, and none of them have been paid. In fact, Dr. Doyan asserted that he did "nothing wrong" in any of the cases and simply chose not to defend any malpractice claims brought against him as a "matter of principle."

According to Dr. Doyan's preoperative notes taken on August 8, 1990, he and the Plaintiff planned for her abdominal scar from her prior hysterectomy to be revised during the surgery. This is consistent with the Plaintiff's testimony to the effect that Dr. Doyan promised that her "tummy tuck" would result in minimal visible scars. Although Dr. Doyan testified that he affirmatively indicated to Mrs. Abrahamson that she would have a horizontal scar after her tummy tuck, such discussion or representation is not reflected by any of his notes.

Dr. Doyan testified that even when breast augmentation by fat injection is performed, the fat should be injected "under the breast and above the [chest] muscles." Nevertheless, the operative reports and testimony of Dr. Tomaselli indicate that she removed a single mass from within each breast with partially necrotic fat. In addition, Dr. Doyan injected up to 270 cc's of fat into Virginia Abrahamson's breasts, even though as of 1987, Dr. Doyan was aware that other more experienced doctors recommended that, in order to have the fat augmentation succeed, each deposit of fat should be only a couple of cc's with a maximum total injection of 130 cc's. Apparently, even this more conservative procedure was criticized in the medical community.

Although Dr. Doyan testified that procedures in his office operating suite are just as safe as a hospital, he admitted that unlike a hospital:

1. he does not perform routine preoperative lab work;

2. he never has the air coming into or out of his surgical center monitored or tested;

3. he has no special filters on the vents that bring air into or out of his surgical suite; and

4. other than a nurse anesthetist, he has no general nursing or record-taking assistance during the procedure.

Dr. Doyan admitted that he did not inform Virginia Abrahamson that (1) he had only done between four and six breast augmentations prior to hers; (2) he had only done a few abdominoplasties; and (3) he had not performed or participated in any plastic or reconstructive surgical residency. Lastly, Dr. Doyan testified that the sole reason for having Mrs. Abrahamson's surgeries performed in his office was to save the Plaintiff

money, when in fact, the debtor lacked privileges to perform cosmetic surgeries at any hospital.

### *Discussion*

██ The issue before this Court is whether Virginia Abrahamson's debt falls within an exception to the discharge otherwise granted to the Debtor pursuant to 11 U.S.C. § 727. The exceptions invoked by the Plaintiff are § 523(a)(2)(A) and § 523(a)(6). As to all of Plaintiff's claims, Plaintiff is required to prove each element by a preponderance of the evidence. *In re Berman,* 154 B.R. 991, 1000–1001 (Bankr.S.D.Fla.1993). Each exception will be discussed in turn below.

### *Section 523(a)(2)(A)*

Section 523(a)(2)(A) provides in relevant part:

A discharge under § 727 ... of this Title does not discharge an individual from any debt—

(2) to the extent obtained by—

(A) false pretenses, false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

██ It is without dispute in this case that the Plaintiff's claim and the judgment constitute a "debt" within the context of 11 U.S.C. § 523(a)(2)(A). *See, In re St. Laurent, II,* 991 F.2d 672, (11th Cir.1993). *See also, In re Pouliot,* 196 B.R. 641 (Bankr.S.D.Fla.1996).

As to the requirement that the Plaintiff demonstrate that the Debtor made a material representation or omission, the willful misrepresentation of medical experience and expertise has been found to give rise to a nondischargeable debt. *Berman,* 154 B.R. at 1002. For instance, in *Berman,* the Court determined that a debt owed pursuant to a final judgment for medical malpractice was nondischargeable based on the findings that:

(1) the Debtor/physician deceptively embellished his office reception area with framed copies of articles praising his abilities as a cosmetic surgeon which he drafted himself as paid advertisements;

(2) the Debtor/physician told the plaintiffs that the professional organizations to which he belonged were not "fly-by-night" associations, however, he failed to also explain that the associations were self-designated and not officially recognized by leading medical groups;

(3) the Debtor/physician purposefully overstated his credentials and experience to induce the patient to undergo cosmetic surgery with him;

(4) the Debtor/physician induced his patient to have breast surgery by offering her a special discount for multiple procedures and assured her that she would have no visible scars resulting from breast surgery, and

(5) the Debtor/physician represented that the surgeries were performed in his office to save money when, in fact, the Debtor lacked staff privileges at any hospital.

██ As in *Berman,* the Court finds in this case that the Debtor misrepresented to the Plaintiff his qualifications and experience as a cosmetic surgeon. Although Dr. Doyan held himself out as "specializing in cosmetic surgery," he was not Board-certified in plastic surgery, he was not Board-certified in reconstructive surgery, and "cosmetic surgery" was not a specialty or sub-specialty recognized in the United States. Individuals like the Plaintiff who are not knowledgeable or involved in the medical profession could not have readily understood the important distinction between a Board-certified plastic or reconstructive surgeon and a Board-certified general surgeon who "specializes" in cosmetic surgery.

The Court finds that if the Plaintiff had known the true extent of the debtor's experience and training in cosmetic surgery; that he had no privileges to perform cosmetic surgical procedures at any hospitals and that the medical organizations to which he belonged were self-designated and not recognized by leading medical associations or the State of Florida; she would not have undergone the surgical procedures performed by the Debtor.

The Debtor also misrepresented the nature and extent of the procedures to be

utilized during the abdominoplasty. He grossly misled the Plaintiff as to the incisions and post-operative scars she would sustain. Dr. Doyan induced Plaintiff's consent to a full abdominoplasty with a false representation that either he would only cut along the existing hysterectomy scar when performing the abdominoplasty, or that the new scar would supplant (revise) the old scar and would be consistent with the nature, extent and character of the hysterectomy scar.

The Court also finds that the Debtor fraudulently induced the Plaintiff to undergo a highly criticized procedure (breast augmentation by fat injection) by offering it free of charge and by assuring the Plaintiff that it was safe and actually more desirable than alternatives such as saline implants. The Debtor failed to inform the Plaintiff that fat injection is not an accepted procedure by most of the medical community, and he failed to fully explain the complications associated with the procedure such as fat reabsorption, fat necrosis, and the likelihood of cyst formation.

Finally, the Court finds the Debtor's failure to post the disclosure mandated by Fla. Stat. 458.320 when he chose to discontinue his medical malpractice insurance was an intentional effort by the Debtor to avoid or deflect inquiry regarding his financial status. Dr. Doyan failed to use the words "medical malpractice insurance" or to indicate that the notice was being placed or posted as required by law. Dr. Doyan intentionally omitted any meaningful explanation of the substance or intent of Florida law embodied in Chapter 458. Under Florida Statute 458.320, the notice must state:

> Under Florida law, physicians are generally required to carry medical malpractice insurance or otherwise demonstrate financial responsibility to cover potential claims for medical malpractice. **YOUR DOCTOR HAS DECIDED NOT TO CARRY MEDICAL MALPRACTICE INSURANCE.** This is permitted under Florida law subject to certain conditions. Florida law imposes penalties against non-insured physicians who fail to satisfy adverse judgments arising from claims of medical mal-

practice. This notice is provided pursuant to Florida law.

Dr. Doyan's "sign", which lacks any of the above required language, is tantamount to no notice. In that Dr. Doyan is conversant in the terms of the statute, it is without doubt that he was aware of the requirements of the law. Accordingly, his failure to comply can only be construed as an intentional act of both omission and misrepresentation.

Considering the above, the Court finds the requirements of § 523(a)(2)(A) to be satisfied, and the debt owed pursuant to the final judgment is nondischargeable.

### § 523(a)(6)

Section § 523(a)(6) provides in pertinent part:

> (a) A discharge under § 727 . . . of this title does not discharge an individual debtor from any debt—
>
> (6) For willful and malicious injury by the debtor to another entity or to the property of another entity.

■ According to the applicable decisions in the Eleventh Circuit, the phrase "willful and malicious" has been interpreted to require more than the intent to perform the act that resulted in the injury. The Debtor must have intended the injury or committed an intentional act which was "substantially certain" to cause injury. *See, In re Walker,* 48 F.3d 1161, 1165 (11th Cir.1995); *In re Ikner,* 883 F.2d 986, 991 (11th Cir.1989); *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1263 (11th Cir.1988). Under these cases, the term "malicious" means wrongful and without just cause. Such malice may be implied or constructive. *Walker,* 48 F.3d at 1164.

■ Thus, the issue under § 523(a)(6) is whether the conduct of the doctor constitutes an intentional wrongful act or omission which was substantially certain to cause the Plaintiff injury or loss. For the reasons discussed below, I find that it does.

■ The Final Order entered by the State Board of Medicine was based upon the finding of clear and convincing evidence. *Ferris v. Turlington,* 510 So.2d 292 (Fla.1987). Even though it is currently on appeal, it is

entitled to be treated as a final expression of the matters concluded therein. *In re Grim,* 104 B.R. 486 (Bankr.S.D.Fla.1989). In the decision, the Board specifically found that (1) the Debtor was practicing medicine "below the standard of care, skill, and treatment which a reasonably prudent physician would find acceptable ...," (2) the Debtor did not conduct standard pre-operative tests to insure the contemplated procedures were appropriate considering the health of the patient; and (3) the Debtor took an inadequate pre-operative history and physical examination of the Plaintiff prior to surgery.

In addition to treating the Plaintiff in a manner that was below the standard of care required of a physician, the Debtor also performed breast augmentation by fat injection, a highly criticized procedure, in a manner in which the experts agree was doomed to failure. Dr. Doyan failed to follow the "recommended" conservative operative procedures for fat injection advocated by those physicians whom he acknowledged as leaders in this controversial field. He did not disburse the fat well; he did not inject the fat under the breast, but into it; and he exceeded the maximum per breast injection. In that the procedures performed on Virginia Abrahamson deviated even from the radical/experimental guidelines, it can only be concluded that the performance of the fat injection on Virginia Abrahamson was an intentional act substantially certain to result in harm to the patient. The Court finds that the Debtor acted with a callous disregard for the Plaintiff and the standard of care owed to her and, under the circumstances of this case, finds the Debtor's actions to be willful and malicious.

Moreover, the above course of conduct was undertaken by the Defendant while he was not carrying medical malpractice insurance and while he was transferring all of his assets out of the reach of creditors. At the time of filing his petition, the Debtor claimed to have accumulated $1,100.00 in assets, $1,000.00 of which is exempt pursuant to Florida law. Nevertheless, Dr. Doyan always commanded a medium to high five-figure income, paid his wife a salary, expanded his surgical suites, and opened and closed numerous corporations or "P.A.'s" for the practice of surgery or cosmetic surgery. He also indirectly owns or controls three vehicles and two parcels of real estate.

The Court also notes that sometime during the late 1980's and early 1990's, the Debtor arranged for the sale and lease back of his surgical and operating equipment such that, by the time he filed bankruptcy, no such surgical or operating equipment was owned in his name. The Court finds that this conduct was willfully and maliciously undertaken with the express purpose of making himself judgment-proof.

Considering the facts as set forth above, the Court finds that the actions taken by the Debtor were willful and malicious and substantially likely to result in injury to the Plaintiff. As such, the debt owed to Plaintiff pursuant to the medical malpractice judgment is nondischargeable pursuant to § 523(a)(6).