**In the Matter of Gawaine C. NEAL, Brenda I. Neal, Debtors.**

**Rentrak Corporation, Plaintiff,**

v.

**Gawaine C. Neal, Individually and d/b/a Video King/Sea Video Rental, Defendant.**

**Bankruptcy No. 02–54169 RFH. Adversary No. 02–5181.**

United States Bankruptcy Court, M.D. Georgia, Macon Division.

Oct. 3, 2003.

Robert A. Fricks, Macon, GA, for Plaintiff.

Michael A. Dillon, Forsyth, GA, for Defendant.

## *MEMORANDUM OPINION*

ROBERT F. HERSHNER, JR., Chief Judge.

Rentrak Corporation, Plaintiff, filed on December 3, 2002, a Complaint to Determine Dischargeability of Debt. Gawaine C. Neal, Defendant, filed his answer on December 18, 2002. Plaintiff's complaint came on for trial on May 28, 2003. The Court, having considered the evidence presented and the arguments of counsel, now publishes this memorandum opinion.

## *FINDINGS OF FACT*

Defendant purchased a video tape rental business in 1994. Some 6,000 video tapes were included in the purchase. Defendant's business was known as Sea Video Rental, Inc. d/b/a Video King (hereafter

Video King). Defendant was the president and operator of Video King. Defendant also owned and operated a Radio Shack franchise.[1] Defendant's Video King and Radio Shack businesses were located in the same building in Forsyth, Georgia.

Plaintiff is a distributor of prerecorded video tapes (i.e. movies). Plaintiff and Video King entered into a "Rentrak Agreement" dated October 1, 1999. Defendant signed the agreement as president of Video King. Defendant personally guaranteed Video King's obligations. Pursuant to the agreement, Plaintiff provided tapes to Video King. Video King would in turn rent the tapes to the public. Defendant concedes that Plaintiff retained ownership of the tapes. After renting tapes for ninety days, Video King could sell some copies of the tapes. Video King did not have to obtain Plaintiff's permission to sell the tapes. After about six months, Video King could purchase the remaining tapes or could return the tapes to Plaintiff. Video King could purchase tapes only if its account with Plaintiff was current. Plaintiff and Defendant each were entitled to a portion of the proceeds from the rental and sale of tapes.

Plaintiff provided Video King with "Point of Sale" computer software. Video King was to scan a tape when the tape was rented or sold. The computer software recorded information concerning the rental or sales transaction. The computer software enabled Plaintiff and Video King to determine their portions of the rental and sales proceeds. Each evening Video King was to transmit the rental and sales information to Plaintiff. Plaintiff would use this information to submit bills to Video King.

---

1. The evidence is not clear whether the Radio Shack franchise was part of the business that Defendant purchased in 1994.

The Rentrak Agreement provides that Video King has a fiduciary duty to hold in trust and remit Plaintiff's portion of the proceeds. *Rentrak Agreement*, para. 7(E), 3(Q)(ii) (Plaintiff's Exhibit 1.)

Video King was not required to deposit Plaintiff's portion of the proceeds into a separate account. Defendant deposited all proceeds from his Video King and Radio Shack businesses into a common operating account. The operating expenses of Video King and Radio Shack were paid from this common operating account.

Monroe County Bank financed the purchase of Defendant's residence in October of 1993. The bank held a mortgage on Defendant's residence. The loan had a term of three years and a balloon payment.

Defendant refinanced the mortgage on his residence with Monroe County Bank in 1996 and again in September of 1999. The term of each loan was three years with a balloon payment.

Video King began having financial problems in late 1999. Defendant testified that the local cable television operator began offering pay-per-view movies. Defendant testified that Wal–Mart and other retailers began selling tapes. Defendant testified this had a dramatic negative impact on his tape rental business.

Video King had obtained a business loan from Monroe County Bank. Video King renewed the loan in August of 2000. The renewal loan was in the amount of $52,267.50. Defendant used some of the loan proceeds to operate his businesses. The term of the loan was five years with monthly payments of $1,126.36.[2] The bank received as collateral a second mortgage on Defendant's residence[3] and a security interest in all assets of Video King and Radio Shack.

Video King continued to have financial problems. Video King ceased remitting Plaintiff's portion of the proceeds around August of 2001. Plaintiff sent Defendant via certified mail a letter dated October 25, 2001, stating that Video King was in default under the Rentrak Agreement and that Plaintiff was suspending Video King's tape ordering privileges. Defendant received the letter on October 29, 2001.[4] Plaintiff demanded return of its tapes within fifteen days and payment of the outstanding balance on Video King's account, $8,778.38, within twenty days.[5] The letter states that Video King would be charged the retail price of the tapes, a total of $54,442.96, unless the tapes were returned within fifteen days.[6] Plaintiff ceased sending video tapes to Video King in October of 2001. Video King did not return any tapes in response to Plaintiff's demand. Video King continued to rent

2. The monthly payments would fully amortize the loan over five years.

3. Monroe County Bank also held the first mortgage on Defendant's residence.

4. Defendant signed the receipt for the letter on October 29, 2001. *See* Plaintiff's Exhibit 2.

5. The Rentrak Agreement provides that Video King shall, upon default or termination of the agreement, return all tapes to Plaintiff within ten days and pay all outstanding balances within seven days. *Rentrak Agreement*, para. 19(A).

6. The Rentrak Agreement provides that upon default "Retailer [Video King] agrees to pay the then current manufacturer's suggested retail price for any [video tapes] not returned to Rentrak [Plaintiff] within the time allowed herein, or any extension of such time granted in writing by Rentrak. If any [video tape] does not have a manufacturer's suggested retail price, Retailer [Video King] agrees to pay Rentrak the wholesale price set by the Program Supplier divided by 0.63." *Rentrak Agreement*, para. 19(C).

and sell tapes until May of 2002. Video King did not send any of the proceeds to Plaintiff.

Defendant testified that he deliberately "turned off" the Point of Sale computer software in October of 2001, so that Plaintiff would not know about his tape rentals and sales.[7] Defendant testified that he understood that the software system was the only way for Plaintiff to know about his tape rentals and sales. Defendant testified that it was "taking everything I had" to stay in business. Defendant testified that he understood that Plaintiff's portion of the proceeds was not his money. Defendant admits receiving telephone calls and letters from Plaintiff demanding return of its tapes. Defendant admits that he rented and sold Plaintiff's tapes after October of 2001 and that he did not send any proceeds to Plaintiff.

Plaintiff sent Defendant a letter dated December 4, 2001, extending the time for returning Plaintiff's tapes until December 10, 2001. The letter states that Defendant would be charged $54,442.96 if he failed to return the tapes. Defendant did not return the tapes.

Plaintiff's representative, Amanda Ross, testified that Plaintiff tried to pick up its tapes from Video King. Defendant testified that no one from Plaintiff came to pick up the tapes. It is undisputed that Plaintiff did not pick up its tapes.

Defendant closed his Video King business in May of 2002. Defendant did not have a going-out-of-business sale. Monroe County Bank learned that Defendant was planning to sell his business. Monroe County Bank sent a letter dated June 13, 2002, reminding Defendant that the bank had a security interest in the assets of the businesses and that the proceeds from the sale of the assets "are to be applied to the loans at Monroe County Bank."

Defendant, in late July of 2002, sold his remaining inventory of some 8,200 tapes to a wholesale dealer named Video Group Distributor. Plaintiff had supplied Video King with a total of some 1,500 tapes. Defendant was supplied with video tapes by other distributors. Thus, some of the tapes that Defendant sold came from distributors other than Plaintiff. Defendant knew that Plaintiff owned some of the tapes. Defendant did not inventory the tapes prior to the sale. Defendant received the sales proceeds, $13,400, in August of 2002. Defendant testified that he paid $1,300 to his attorney and paid the remainder of the sales proceeds to Monroe County Bank. Plaintiff did not receive any of the sales proceeds. Defendant testified that he was concerned that the bank would not renew his residential loan when the balloon payment came due in September of 2002. Defendant testified that he paid the proceeds to the bank to keep his residence.

Defendant failed to pay rent on the building where his Video King and Radio Shack businesses were located. Defendant was evicted in August of 2003, a short time after the tapes were removed by Video Group Distributor.

Plaintiff filed a complaint in state court in Oregon.[8] Defendant testified that he did not file a response to Plaintiff's complaint. Plaintiff's representative testified that the state court lawsuit has been "domesticated" in Georgia.[9]

---

7. The Rentrak Agreement provides a "liquidated damages formula" to determine Plaintiff's damages should Video King fail to report rental and sales transactions. *Rentrak Agreement*, para. 19(E).

8. The Rentrak Agreement provides that any lawsuit shall be brought in Oregon. *Rentrak Agreement*, para. 25.

9. The evidence is not clear concerning the state court proceedings. Plaintiff probably

Plaintiff's representative, Ms. Ross, testified that Plaintiff supplied about 1,500 tapes to Video King. Ms. Ross testified that Video King did not return any tapes. Some tapes were Grade A movies and some were Grade B (minor titles) movies. Ms. Ross testified that different tapes have different values. Ms. Ross testified that Video King owes $54,442.96. Ms. Ross testified that this amount does not include any rentals or tape sales that occurred after Defendant turned off the Point of Sale computer software in October of 2001.

Marvin T. Carr, Jr., is an assistant vice-president of Monroe County Bank. Defendant was obligated on two loans at the bank in October of 2001. Defendant was obligated on a residential loan which was secured by a first mortgage on his residence. This loan had a balloon payment due in September of 2002. Defendant was also obligated on a business loan which was secured by a second mortgage on his residence and all assets of Video King and Radio Shack. Mr. Carr testified that Defendant was a good customer and was current on his payments under the residential and business loans.

Defendant renewed his loans at Monroe County Bank on December 17, 2002.[10] The new loan is for $72,319.90 with a three year term and a balloon payment. The loan is secured by a mortgage on Defendant's residence.

Defendant filed a petition under Chapter 7 of the Bankruptcy Code on September 19, 2002.

### CONCLUSIONS OF LAW

■ Defendant concedes that Video King rented and sold tapes without remitting Plaintiff's portion of the proceeds. Defendant personally guaranteed Video King's obligations. Plaintiff contends that Defendant's obligations are nondischargeable under subsections 523(a)(4) and (6) of the Bankruptcy Code.[11] These subsections provide, as follows:

**§ 523. Exceptions to discharge**

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

11 U.S.C.A. § 523(a)(4), (6)(West 1993 and Supp.2003).

■ Plaintiff has the burden of proving all facts essential to support its objection to dischargeability by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

"The validity of a creditor's claim [against a bankrupt debtor] is determined by rules of state law. Since 1970, however, the issue of nondischargeability has been a matter of federal law governed by the terms of the Bankruptcy Code." *Grogan v. Garner,* 111 S.Ct. at 657–58.

■ Exceptions to dischargeability are to be construed strictly. *Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986). "The exceptions to discharge were not intended and must not be

obtained judgment by default in state court in Oregon. The evidence is not clear whether this was a money judgment or a writ of possession for the tapes.

**10.** This renewal was a consolidation of Defendant's personal and business loans.

**11.** 11 U.S.C.A. § 523(a)(4), (6) (West 1993 and Supp.2003).

allowed to swallow the general rule favoring discharge." *Murphy & Robinson Investment Co. v. Cross (In re Cross)*, 666 F.2d 873, 880 (5th Cir. Unit B 1982).

Section 523(a)(4) provides that a debtor will not be discharged from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. *Collier on Bankruptcy* states:

> Debts for fraud or defalcation while acting in a fiduciary capacity are excepted from discharge.
>
> . . .
>
> "Fraud" for purposes of this exception has generally been interpreted as involving intentional deceit, rather than implied or constructive fraud.
>
> . . .
>
> Defalcation refers to a failure to produce funds entrusted to a fiduciary and applies to conduct that does not necessarily reach the level of fraud, embezzlement or misappropriation. Since debts arising from breaches of ordinary care are normally dischargeable in bankruptcy, and exceptions to discharge are strictly construed in favor of the debtor, some degree of culpability is required to make a debt nondischargeable as a defalcation under section 523(a)(4).

4 *Collier on Bankruptcy* ¶ 523.10[1], p. 523–70, –71 (15th ed. rev.2003).

In *Farmers and Merchants Bank of Eatonton, Georgia v. Brinsfield (In re Brinsfield)* [12], this Court stated:

> Before the Court can find a debt nondischargeable for fraud or defalcation under subsection (a)(4), the Court must find that Defendant was acting in a fiduciary capacity. Within the meaning of section 523(a)(4), a fiduciary relationship is a relationship based upon a technical or express trust. The fiduciary relationship required by the Code is not one implied by contract or by the factual situation of the parties and the law, nor does it encompass ordinary commercial relationships such as debtor-creditor and principal-agent.
>
> . . .
>
> An act of embezzlement will render a debt nondischargeable regardless of whether Defendant was acting in a fiduciary capacity. Embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come."
>
> . . .
>
> Before Defendant's debt can be found nondischargeable for embezzlement, Plaintiff also must establish that Defendant acted with fraudulent intent. An intent to defraud is defined as "an intention to deceive another person, and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter or terminate a right, obligation or power with reference to property."

78 B.R. at 369–70.

In *Belfry v. Cardozo (In re Belfry)* [13], the Eight Circuit Court of Appeals stated:

> [To prove embezzlement] a plaintiff must establish that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used.
>
> . . .
>
> Obligations sufficient to support a claim of embezzlement are ones which make the debtor's discretionary use of the payment, prior to complying with the obligations, improper. On the other hand, terms which manifest

---

12. 78 B.R. 364 (Bankr.M.D.Ga.1987).

13. 862 F.2d 661 (8th Cir.1988).

nothing more than the "hope [ ] that no problem will ensue after a carefully and skillfully negotiated agreement is set forth in a legally enforceable contract," will not support a claim of embezzlement.

862 F.2d at 662–63.

"Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner." *Kaye v. Rose (In re Rose)*, 934 F.2d 901, 903 (7th Cir.1991).

*Collier on Bankruptcy* defines larceny as follows:

Larceny is the fraudulent and wrongful taking and carrying away of the property of another with intent to convert the property to the taker's use without the consent of the owner. As distinguished from embezzlement, the original taking of the property must be unlawful. For purposes of section 523(a)(4), a bankruptcy court is not bound by the state law definition of larceny but, rather, may follow federal common law, which defines larceny as a "felonious taking of another's personal property with intent to convert it or deprive the owner of same."

In short, section 523(a)(4) excepts from discharge debts resulting from the fraudulent appropriation of another's property, whether the appropriation was unlawful at the outset, and therefore a larceny, or whether the appropriation took place unlawfully after the property was entrusted to the debtor's care, and therefore was an embezzlement.

*4 Collier on Bankruptcy* ¶ 523.10[2], p. 523–76, –77 (15th ed. rev.2003).

In *Quaif v. Johnson,*[14] the debtor, a licensed insurance agent, failed to remit insurance premiums which he collected on

behalf of an insurance company. The Eleventh Circuit Court of Appeals affirmed the decision of the district court which held that the debtor was acting in a fiduciary capacity when he acquired the premiums, and that the debtor had committed a defalcation by failing to remit the premiums to the insurance company. The district court noted that although Georgia law requires that the premiums must be kept separate from other types of funds, premiums may be kept in a common account as long as there are adequate records of the sources of the funds. The district court stated that this segregation is sufficient to satisfy the requirement that the fiduciary duties be created prior to the act of defalcation. The district court stated that defalcation refers to a failure to produce funds entrusted to a fiduciary, even though the failure may not arise to the level of fraud, embezzlement, or even misappropriation. 4 F.3d at 954–55.

Section 523(a)(6) provides that a debtor may not discharge any debt for willful and malicious injury to another entity or to the property of another entity.

■ "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998).

"Willful means intentional or deliberate and can not be established merely by applying a recklessness standard." *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 989 (11th Cir.1989).

■ Malicious means wrongful and without just cause or excessive even in the absence of personal hatred, spite, or ill

14. 4 F.3d 950 (11th Cir.1993).

will. *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1164 (11th Cir.1995).

■ An act of reckless disregard of the rights of others is insufficient to constitute willful and malicious conduct. *American Cast Iron Pipe Co. v. Wrenn (In re Wrenn)*, 791 F.2d 1542, 1544 (11th Cir. 1986).

■ "Willful and malicious injury includes willful and malicious conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights." *Wolfson v. Equine Capital Corp. (In re Wolfson)*, 56 F.3d 52, 54 (11th Cir.1995). A creditor's failure to take reasonable steps to protect its collateral prevents application of the exception to discharge under section 523(a)(6). *Id.* at 55.

The Court has considered two reported decisions with similar facts in which Plaintiff was a party.

In *Rentrak Corp. v. Forbes (In re Forbes)*,[15] Rentrak discovered that the debtors had sold numerous tapes and had failed to report the sales as required by the Rentrak Agreement. The debtors closed their video stores and filed for Chapter 7 relief. Rentrak contended that the debtors' failure to remit proceeds from the sales of tapes was a nondischargeable willful and malicious injury under section 523(a)(6).

The bankruptcy court agreed that the debtors' obligations were nondischargeable and stated:

By selling and otherwise disposing of the Rentrak Tapes, each of the Corporations exercised ownership over goods belonging to Plaintiff without Plaintiff's authorization. The Corporations' exercise of ownership was to the exclusion of

Plaintiff's rights in the Rentrak Tapes, including Rentrak's security interest in the Rentrak Tapes. These Corporations' acts constitute conversion of the Rentrak tapes. *In re Wolfson*, 56 F.3d 52, 53 (11th Cir.1995); *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1559 (11th Cir.1987); *In re Bullington*, 167 B.R. 157, 162 (Bankr.W.D.Mo.1994); *Belford Trucking Co. v. Zagar*, 243 So.2d 646 (Fla. 4th D.C.A. 1970).

Similarly, by selling and otherwise disposing of the Rentrak Tapes in which Plaintiff had legal interests, including Plaintiff's security interest, each of the Corporations exercised ownership over and sold or otherwise disposed of Plaintiff's goods. The Corporations' sale and disposition of the Rentrak tapes were without the authorization of Plaintiff and without the remittance of the proceeds to Plaintiff. The Corporations' actions were taken to the exclusion of Plaintiff's legal rights in the Rentrak Tapes and, therefore, constitute sales out-of-trust of the Rentrak Tapes. *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1263 (11th Cir.1988); *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556, 1557; *Transamerica Commercial Finance Corporation v. James*, 152 B.R. 994, 995 (M.D.Fla.1992).

186 B.R. at 767–68.

In *Rentrak Corp v. Cady (In re Cady)*[16] the debtor sold video tapes and used the proceeds to operate his business. The debtor did not pay Rentrak its share of the proceeds. Rentrak contended that the debtor's obligations were nondischargeable as an embezzlement or as a willful and malicious injury. The bankruptcy court held that the sale of the tapes was not an embezzlement because the debtor had au-

---

**15.** 186 B.R. 764 (Bankr.S.D.Fla.1995).

**16.** 195 B.R. 960 (Bankr.S.D.Ga.1996)(Walker, J.).

thority under the Rentrak Agreement to sell the tapes without prior approval of Rentrak. The bankruptcy court held that the debtor's failure to pay proceeds to Rentrak was not an embezzlement. The bankruptcy court noted that where a debtor is not required to isolate funds in a separate account and has unrestricted use of the funds, the creditor is merely an unpaid creditor rather than a victim of embezzlement. The bankruptcy court stated the debtor did not commit embezzlement because the debtor was authorized to use the proceeds in the everyday operation of his store.

The bankruptcy court also held that the debtor's actions did not result in a willful and malicious injury. The bankruptcy court stated that the sale of tapes without using the computer software to record the transactions was merely a breach of contract. The bankruptcy court stated that the failure to remit the proceeds was the debtor's attempt to keep his business afloat. The bankruptcy court noted that not every conversion of property will rise to the level of willful and malicious injury.

Turning to the case at bar, Plaintiff provided tapes to Defendant's business. Defendant personally guaranteed Video King's obligations. Plaintiff retained ownership of the tapes. Video King could sell the tapes without obtaining Plaintiff's permission. Video King was not required to deposit Plaintiff's portion of the rental and sales proceeds into a separate account. Defendant deposited all proceeds from his Video King and Radio Shack businesses into a common operating account. Defendant used the funds to pay his business expenses. Video King had financial problems and was unable to remit Plaintiff's portion of the proceeds. Defendant received Plaintiff's letter demanding the return of its tapes on October 29, 2001. The Court is persuaded by the reasoning of *In re Cady* that the failure to remit proceeds from the rental and sale of tapes prior to October 29, 2001 is a dischargeable obligation.

On October 29, 2001, Defendant received Plaintiff's demand for the return of the tapes. Video King did not return any tapes. Defendant deliberately turned off the computer software so that Plaintiff would not know about the tape rentals and sales. Thus, Defendant took affirmative steps to conceal his actions. Defendant received telephone calls and letters from Plaintiff demanding return of its tapes. Defendant continued to rent and sell tapes after October 29, 2001 but did not remit any proceeds to Plaintiff. The Court can only conclude that Defendant knew that he no longer had authority to rent or sell Plaintiff's tapes.

Defendant closed his Video King business in May of 2002. Defendant sold his remaining tape inventory in July of 2002. Defendant testified that he knew that Plaintiff's tapes were not his property. Defendant knew that he no longer had authority to sell the tapes. Defendant did not use the proceeds to operate his business. Defendant used the proceeds to pay down his obligations to Monroe County Bank. The Court is persuaded that Defendant converted to his own use Plaintiff's tapes. The Court is also persuaded that Defendant knew that his failure to remit the proceeds was substantially certain to cause injury to Plaintiff. The Court can only conclude that Defendant's obligations to Plaintiff that arose on or after October 29, 2001 are nondischargeable in bankruptcy because Defendant acted willfully and maliciously.

 Defendant argues that Plaintiff failed to take reasonable steps to protect its tapes. Defendant notes that Plaintiff did not pick up its tapes after Plaintiff demanded return of its tapes. *See In re*

*Wolfson,* 56 F.3d at 55 (creditor's failure to take reasonable steps to protect its collateral prevents application of the exception to discharge under section 523(a)(6)).

Defendant concedes that he received telephone calls and letters from Plaintiff demanding return of its tapes. Plaintiff filed a complaint in state court against Defendant. Defendant failed to file a response. Defendant knew that he did not have authority to sell Plaintiff's tapes. The Court is persuaded that Plaintiff acted reasonably.

The Court is unable from the evidence presented at trial to determine the amount of Defendant's nondischargeable obligation. The amount of Defendant's obligation will need to be determined under the laws of the State of Oregon and certain provisions in the Rentrak Agreement. The Court is persuaded that Plaintiff should liquidate its damages in state court.

An order in accordance with this memorandum opinion will be entered this date.